231 P.3d 423

UNITE HERE! LOCAL 5; Eric W. Gill; Todd A.K. Martin, Respondents/Plaintiffs–Appellees,

v.

CITY AND COUNTY OF HONOLULU, a municipal corporation; Kuilima Resort Company, a Hawai'i corporation, Respondents/Defendants–Appellees.

Kuilima Resort Company, a Hawai'i general partnership, Respondent/Counterclaim Plaintiff–Appellee,

v.

Unite Here! Local 5 Hawai'i, a Hawai'i labor organization; Eric W. Gill, an individual, Respondents/Counterclaim Defendants–Appellees.

Kuilima Resort Company, a Hawai'i general partnership, Respondent/Counterclaim Plaintiff–Appellee,

v.

Unite Here!, a New York labor organization, Respondent/Additional Counterclaim Defendant–Appellee.

Keep the North Shore Country, a Hawai'i non-profit corporation; and Sierra Club, Hawai'i Chapter, a foreign non-profit corporation, Petitioners/Plaintiffs–Appellants,

v.

City and County of Honolulu; Henry Eng, Director of Department of Planning and Permitting, in his official capacity; Kuilima Resort Company, a Hawai'i general partnership, Respondents/Defendants–Appellees.

Nos. 06–1–0265, 06–1–0867.
No. 28602.

Supreme Court of Hawai'i.

April 8, 2010.

152

Rory R. Wicks (Marco A. Gonzales, with him on the application, of Coast Law Group, Encinitas, CA), appearing pro hac vice; (William S. Hunt and Laura P. Couch, with him on the application, of Alston Hunt Floyd & Ing, Honolulu), for petitioners/plaintiffs-appellants.

Don S. Kitaoka, Deputy Corporation Counsel, for respondent/defendant-appellee City & County of Honolulu and Henry Eng.

Sharon V. Lovejoy (Terence J. O'Toole, Lane Hornfeck McKay, and Shyla P. Cockett, with her on the response, of Starn O'Toole Marcus & Fisher, Honolulu), for respondent/defendant-appellee Kuilima Resort.

Isaac H. Moriwake (of Earth Justice), for Conservation Council for Hawaii, Surfrider Foundation, Hawaii's Thousand Friends, Life of the Land, Maui Tomorrow Foundation, and Kahea.

Gregory W. Kugle (of Damon Key Leong Kupchak and Hastert, Honolulu), for Defend Oahu Coalition.

Vernon Y.T. Woo, Honolulu, for North Shore Career Training Corporation, Laie Community Association, and Kahuku Community Association.

David A. Arakawa and David L. Callies, Honolulu, for Land Use Research Foundation of Hawaii, Hawaii Developer's Council, and Hawaii Leeward Planning Conference.

Melvyn M. Miyagi, Jonathan W. Lai, and Ross T. Shinyama (of Watanabe Ing, Honolulu), for First Hawaiian Bank.

Dr. Nui Loa Price, appearing pro se.

MOON, C.J., NAKAYAMA, and DUFFY, JJ., and Circuit Judge CHAN, in place of RECKTENWALD, J., recused; ACOBA, J., concurring separately.

## Opinion of the Court by MOON, C.J.

On October 13, 2009, this court accepted a timely application for a writ of certiorari, filed by petitioners/plaintiffs-appellants Keep the North Shore Country (KNSC) and Sierra Club, Hawai'i Chapter (Sierra Club) [hereinafter, collectively, plaintiffs] on September 8, 2009, requesting that this court review the Intermediate Court of Appeals' (ICA) June 12, 2009 judgment on appeal, entered pursuant to its May 22, 2009 published opinion. *Unite Here! v. City & County of Honolulu,* 120 Hawai'i 457, 209 P.3d 1271 (App.2009). Therein, the ICA affirmed the Circuit Court of the First Circuit's [1] June 4, 2007 amended final judgment in favor of respondents/defendants-appellees Kuilima Resort (Kuilima), as well as the City and County of Honolulu and Henry Eng, the director of the Department of Planning and Permitting (DPP) [hereinafter, collectively, the County and, along with Kuilima, collectively, defendants]. Oral argument was held on December 17, 2009.

Briefly stated, this case arises from the proposed expansion of the Kuilima Resort at Turtle Bay on the North Shore of O'ahu for which an environmental impact statement (EIS) was completed, pursuant to the Hawai'i Environmental Policy Act (HEPA) (codified as Hawai'i Revised Statutes (HRS) chapter 343), discussed *infra,* and accepted in 1985 by the Department of Land Utilization (DLU) [hereinafter, the 1985 EIS]. The dispute centers around whether Kuilima's subdivision application, filed in 2005, triggered the need for a supplemental EIS (SEIS), pursuant to the administrative rules underlying HEPA, specifically, Hawai'i Administrative Regulations (HAR) §§ 11–200–26 and 11–200–27 (governing SEISs), quoted *infra* at n.12 & 13. The circuit court, in granting summary judgment in favor of the defendants, ruled that a SEIS was not required, and the plaintiffs appealed.

On appeal, a majority of the ICA agreed with the circuit court, holding, *inter alia,* that, pursuant to the plain language of HAR §§ 11–200–26 and 11–200–27, a SEIS was required only where there was a substantial change in the "action," *see* HAR § 11–200–26, quoted *infra,* and that, inasmuch as the defendants were not substantially changing the proposed expansion itself, no SEIS was required. *Unite Here!,* 120 Hawai'i at 465–67, 209 P.3d at 1279–81. Then–Associate Judge Nakamura dissented, asserting that, in his view, the relevant rules required the completion of a SEIS "when significant changes to the anticipated environmental impacts of a proposed action become apparent such that 'an essentially different action' is being proposed." *Id.* at 468, 209 P.3d at 1282 (Nakamura, J., dissenting).

On application, the plaintiffs urge this court to adopt Judge Nakamura's view that HEPA mandates the completion of a SEIS where there has been a change in circumstances or increased environmental impacts and that, therefore, the DPP (the accepting agency for Kuilima's subdivision application) should have required Kuilima to do so.

Based on the discussion below, we hold that the ICA's majority erred in its interpretation of the relevant HARs and, consequent-

---

**1.** The Honorable Sabrina S. McKenna presided unless otherwise indicated.

ly, incorrectly affirmed the circuit court's grant of summary judgment in favor of the defendants. Accordingly, we vacate the ICA's June 12, 2009 judgment on appeal, the circuit court's June 4, 2007 amended final judgment in favor of the defendants, and remand this case to the circuit court with instructions to enter judgment in favor of the plaintiffs.

## I. BACKGROUND

### A. Background Information

As aptly summarized by the ICA:

In the 1980[ ]s, Kuilima's predecessor in interest, Kuilima Development Company (KDC), owned a resort on the North Shore of the [i]sland of Oʻahu. The resort consisted of a 487–room hotel and an 18–hole golf course. KDC proposed the Kuilima Resort Expansion ([p]roject), which would involve expansion of the existing hotel and new construction of three hotels for total of 1,450+ new units; renovation of the existing 18–hole golf course; and new construction of 2,060+ condominium units, a 70,000+ sq. ft. commercial complex, an 18–hole golf course and clubhouse, a tennis center, and an equestrian center. The [p]roject also called for infrastructure and public improvements, including a new wastewater treatment plant, a production water well, a standby well, a new reservoir, new water distribution lines, improvements to the portion of Kamehameha Highway fronting the resort, two private and two public beach parks, a wildlife preserve that included virtually all of Punahoolapa Marsh, and public rights-of-way to the shoreline.

*Unite Here!,* 120 Hawaiʻi at 459, 209 P.3d at 1273.

### 1. 1985 EIS

On August 5, 1985 and in accordance with HEPA, a Draft EIS was prepared and filed with the Office of Environmental Quality Control (OEQC) and, thereafter, published in the OEQC bulletin on August 8, 1985. Public comment contributed to the preparation of a revised EIS, which was submitted to the DLU on October 7, 1985. The revised EIS

was accepted on October 30, 1985 [hereinafter, the EIS or 1985 EIS].

According to the EIS, the proposed project was to be developed in three phases: (1) phase I starting in 1986; (2) phase II in 1988–89; and (3) phase III between 1993 and 1996. The 1985 EIS also indicated that, "[a]t full development, the expanded facilities of the resort would introduce a new visitor population averaging about 4,783 persons on any given day." With regard to evaluation of the environmental setting of the project area and the probable impact of the proposed project on the environment, the 1985 EIS looked to topography and drainage, soils, water resources and usage, tsunami/flood hazards, coastal water quality, vegetation, sand dunes, threatened or endangered endemic species of birds, Punahoʻolapa marsh, historical and archaelogical resources, agriculture, and air quality, as well as traffic and road conditions.

In its analysis of the coastal waters, specifically Kawela Bay, which borders the project, the 1985 EIS referenced the potential impact of "desilting" on green sea turtles, a "threatened" species under the federal Endangered Species Act (ESA). More specifically, it noted that "the desilting operation would be located across the area where the abundant growths of algae that are known to be important diet items of [green sea turtles] are found." There was no reference to any anticipated impact upon the Hawaiian monk seal, an "endangered" species under the ESA.

The EIS also analyzed the "adverse and unavoidable impacts" of the project's development. These identified impacts included drainage, traffic, dust generation, water consumption, marsh drainage input, loss of agricultural uses, construction noise, air quality, and solid waste disposal.

In addressing the adverse and unavoidable traffic impacts of the project, the 1985 EIS relied upon a traffic study that examined the traffic conditions caused by an increase in visitors to the North Shore region on Oʻahu (between Haleiwa and Punaluʻu), with projections through the year 2000. Specifically, the 1985 EIS recognized that:

[a]ccess to the project site is via Kamehameha Highway. Kamehameha Highway

is the only arterial highway serving the North Shore and Windward Oʻahu. It is a two-lane, two-way, undivided State highway generally following the coastline, except for the Kahuku area where it turns inland. The roadway width of Kamehameha Highway varies between 20 and 24 feet, with generally unpaved shoulders. The highway varies from flat straightaways with few driveway connections to a curvilinear alignment with many driveway connections. Between Kahuku and Haleiwa, there are no provisions for left-turn lanes or bus turnouts (except at Waimea Bay).

In most of the communities between Haleiwa and Punaluʻu, the great majority of residents live within a few blocks of Kamehameha Highway. The highway is each community's link with the rest of Oʻahu and a sense of increasing congestion is a major source of concern of area residents. Field investigations of traffic conditions on weekends and holidays show that traffic congestion occurs because of "bottleneck" locations rather than a breakdown of the overall highway facility. This indicates that the highway's capacity restraint is not the number of lanes on the roadway but rather highway geometrics and increased roadside activity.

Haleiwa and Waimea Bay are the primary capacity restraints along the North Shore. The narrow Anahulu Bridge located near Haleiwa Beach Park requires opposing stream of vehicles to slow down. Through Haleiwa, left-turn traffic and motorists pulling off to park on the roadside queue traffic in both directions. Similarly, at Waimea Bay, motorists parking on the roadside and turning left into Waimea Beach Park or into Waimea Valley Road queue traffic in both directions. The curvilinear highway alignment along Waimea Bay causes a further slowdown. Finally, the vehicles parked on the roadside impose additional restraints on capacity and operating speeds. Similar frictional effects occur at other beach parks such as at Pupukea, Sunset, Hauʻula and Swanzy Beach Parks when large gatherings occur (a surf meet or a community picnic). Furthermore, periodic slowdowns occur behind [city] buses stopping in the highway to pick up or drop off passengers.

On the Windward side, between Kuilima to Laie, there are no restraints on capacity other than the highway itself.

The 1985 EIS reported that, "[o]n *the regional level,* previous studies have recognized the highway alignment problems at Waimea Bay and the need for upgrade of the existing Kamehameha Highway." (Emphasis added.) Relying on a 1985 traffic study analyzing the existing regional traffic impacts in the Kahuku, Kawailoa, and Hauʻula areas, the 1985 EIS projected—to the year 2000—the traffic impacts to the aforementioned areas (1) *without* the resort expansion and (2) *with* the resort expansion. In comparing the "with" and "without" resort expansion impacts, the 1985 EIS indicates that the construction of the resort expansion would increase traffic impacts by an average of 37.4% in Kahuku, 14.3% in Kawailoa, and 6.4% in Hauʻula.

The EIS observed that, in order to mitigate the impact of entry into the project from—and exiting the project onto—Kamehameha Highway, at full development, the traffic study recommended: (1) the construction of a left-turn lane on Kamehameha Highway at the existing Kuilima Drive (the main access road to the resort); (2) the construction of fully channelized intersections on Kamehameha Highway with turning lanes at the proposed West Kuilima Drive (also known as the project's "Alpha Road") and at the existing Kahuku Airport Road; (3) the installation of traffic signals on Kamehameha Highway where it intersects with Kuilima Drive, Kahuku Airport Road, and the proposed West Kuilima Drive; and (4) minimization of visitors' use of automobiles by instituting, for example, an airport shuttle service. Despite the suggested improvements, the EIS—quoting the traffic study—also observed that, "[w]hile the increased traffic generated by the proposed resort expansion is significant when compared to the projected background conditions, it is not beyond the carrying capacity of an upgraded, high quality two-lane arterial."

## 2. Initial Approvals and Delays in the Project's Development

As observed by the ICA:

The [1985] EIS listed additional governmental approvals KDC needed to obtain in order to complete development of the [p]roject, including rezoning approval from the DLU, grading and building permits, a shoreline certification, a Special Management Area Use Permit [ (SMP) ], and subdivision approval.

On March 27, 1986, the Land Use Commission approved the reclassification of 236 acres of the property from [a]griculture . . . to [u]rban [d]istrict for resort and golf course uses.

On May 23, 1986, the DLU accepted KDC's application for a [SMP] and [s]horeline [s]etback [v]ariance. KDC sought to expand its resort by developing a master-planned resort community that would include hotels, dwellings, commercial areas, golf courses, parks, roadways; to replace two drainage culverts with open channels; and to conduct a desilting operation at Kawela Bay.

On June 25, 1986, a bill for an ordinance to rezone certain portions of the property to be developed under the [p]roject was introduced before the [City Council]. The bill incorporated the Unilateral Agreement and Declaration for Conditional Zoning ( [u]nilateral [a]greement), in which KDC agreed that the zoning change would be subject to conditions requiring, among other things, construction of a wastewater treatment plant, construction of low-to-moderate-income housing, improvements and modifications to roadways, the implementation of a shuttle service, and the establishment of a child care center, parks, public easements to and along the shoreline, and public parking. Like the [1985] EIS, the [u]nilateral [a]greement anticipated development to proceed in three phases, *the last phase to be completed before 2000.* The [u]nilateral [a]greement noted that development may deviate from the phased development schedule "due to the occurrence of changed economic conditions, lawsuits, strikes or other unforeseen circumstances."

The City Council passed the rezoning bill on August 14, 1986 and approved KDC's application for the [SMP] and [s]horeline [s]etback [v]ariance by resolution adopted on October 1, 1986 (the March 27, 1986; August 14, 1986; and October 1, 1986 approvals are collectively referred to as the [p]roject [e]ntitlements).

Over the next twenty years, only certain aspects of the [p]roject were completed. KDC constructed a wastewater treatment plant and water main between January 1989 and March 1990, the Opana Wells between February 1989 and March 1991, and the Palmer Golf Course between March 1989 and March 1991. Construction of improvements to Punahoolapa Marsh began in approximately March 1990. From 1990 through 1991, KDC obtained subdivision approvals for various parcels to be used for parks, roads, hotels, a golf course, and a golf clubhouse.

In March 1999, Kuilima purchased the property underlying the [p]roject from KDC[,] and KDC assigned its interest in the [p]roject to Kuilima.

In May 1999, the DPP drafted the Ko'olau Loa Sustainable Communities Plan "to help guide public policy, investment, and decision-making through the 2020 planning horizon" in order to maintain and enhance "the region's ability to sustain its unique character, current population, growing [sic], families, lifestyle, and economic livelihood." The plan recognized and supported the [p]roject. The City Council adopted the plan on December 16, 1999.

Kuilima renovated the existing Fazio Golf Course between 2000 and 2002. In 2003, Kuilima obtained approval to renovate and expand existing portions of the Turtle Bay Resort. Between 2003 and 2005, Kuilima invested about $100 million in completing these renovations, which included the addition of nine resort condominium units.

As of November 2005, construction on the major components of the [p]roject, including the hotel rooms and the [remaining] condominium units, had not begun.

120 Hawai'i at 460–61, 209 P.3d at 1274–75 (emphasis added).

### 3. Other Relevant Post–1985 EIS Traffic Studies

After 1985, Kuilima solicited two additional traffic impact analysis reports—in 1991 and 2005.[2] Because the 1985 EIS considered projected traffic impacts through the year 2000, the 2005 updated traffic impact analysis [hereinafter, the 2005 report] and three addendums thereto, prepared in 2006, are particularly relevant.

The 2005 traffic report focused on local traffic impacts, that is, impacts on the roadway fronting the property, including the internal roadways of the resort itself. Generally, the 2005 traffic report indicated that, even with the construction of certain traffic improvements (many of which overlap with the yet incomplete improvements suggested by the 1985 EIS), the expansion project, when completed, *would* result in increased local traffic impacts.

As previously stated, the 2005 report was updated three times in 2006, focusing again on only local traffic impacts. Addendum No. 1, dated February 15, 2006, evaluated the initial design of the intersection of Kamehameha Highway and the project's Alpha Road (also known as the proposed West Kuilima Drive), including turning lanes and the recommended improvements to facilitate the traffic needs of that immediate area, projected out through 2008. The addendum concluded that,

> [a]s Turtle Bay Resort continues to expand *beyond the Year 2008, the peak hour traffic operations at the intersection of Kamehameha Highway and Alpha Road are expected to deteriorate below satisfactory levels of service [ (LOS) ].* Additional improvements at the study intersection, such as traffic signalization and lane modifications, may be required to mitigate the

traffic impacts resulting from further development of the Turtle Bay Resort.

(Emphasis added.)

Addendum No. 2, dated February 23, 2006, evaluated the design of two-lane Alpha Road to determine when it should be widened to a four-lane roadway. It concluded that

> Alpha Road will be constructed as a private roadway and is expected to remain so in the foreseeable future. Traffic operations of the two-lane section of Alpha Road at peak hour volumes over 800 [vehicles per hour] would result in a [below satisfactory LOS]. In general, intersection operations are more critical than the operation of a continuous two-lane roadway. The proposed 108–foot right of way will provide adequate width as to construct turning lanes on the initial two-lane divided roadway at internal resort intersections, as needed. Widening sections of Alpha Road ... would maintain [satisfactory] conditions or better as major [l]ots in the Turtle Bay Resort are developed. The remaining two-lane section of Alpha Road ... is expected to operate at a satisfactory [LOS] at full build out and occupancy of the Turtle Bay Resort Master Plan.

Addendum No. 3, dated August 25, 2006, analyzed the second phase of improvements on Kamehameha Highway, including traffic signalization at the Kamehameha Highway/Alpha Road intersection, improvements at the intersection of Kamehameha Highway and Kuilima Drive, and traffic signalization of the Kamehameha Highway/Kuilima Drive intersection, projected through 2011. The addendum concluded that

> [t]he Kamehameha Highway intersections at Alpha Road and Kuilima Drive are expected to require traffic signalization to accommodate the anticipated expansion of Turtle Bay Resort up to the Year 2011, when a total of 1,970 hotel rooms will be constructed. Lane modification at the study intersections, the extension of Alpha Road from Kuilima Drive to Marconi Road, and the improvement of Marconi

---

2. The record also contains references to a Department of Transportation, Highway Planning Branch's traffic counts taken on Kamehameha Highway in front of the resort, dated August

2000 (2000 DOT traffic count), and a Laniakea Beach Park Traffic Impact Analysis Report, dated 2005 (2005 Laniakea traffic report).

Road and its intersection with Kamehameha Highway will be required to mitigate the traffic impacts resulting from the full-build out and occupancy of Turtle Bay Resort Master Plan[.]

### 4. The 2005 Subdivision Application

As the ICA further summarized:

On November 8, 2005, Kuilima submitted a Site Development Division Master Application Form ( [s]ubdivision [a]pplication) to the DPP, seeking subdivision approval for approximately 744 acres of its 808–acre property.

In response to the [s]ubdivision [a]pplication, the DPP received two letters in January 2006, asking that the DPP require the preparation of a [SEIS] before approving the [s]ubdivision [a]pplication. In a January 5, 2006 letter, Eric Gill, the treasurer of UNITE HERE! Local 5, asserted that a[ ] SEIS was required because twenty years had passed since the [1985] EIS and changes had occurred in the "traffic, water availability, hotel and housing needs, endangered species habitat needs, and the like." North Shore resident Ben Shafer submitted a January 6, 2006 letter, stating that "[m]uch had changed since the approval of the [1985] EIS some twenty years ago" and a[ ] SEIS needed to be prepared to allow for some community input and to address new concerns regarding "[t]ransportation, sewage, housing, water, cultural [issues], [and] the Master Plan for the Koʻolauloa region."

The DPP responded to the Shafer and Gill letters that[,] because no specific time limit had been imposed on the [p]roject at the time of the [p]roject's initial approval, the DPP felt it could not require a[ ] SEIS to address changes in the conditions surrounding the [p]roject caused by the passage of time. Although DPP planner James Peirson (Peirson) drafted the January 19, 2006 reply letter to Shafer, the letter was signed by Eng. The DPP's letter to Shafer stated:

No time frame for development was either implied or imposed by the City Council as part of its approval. Accordingly, the developer is entitled to proceed with the project as approved. By not imposing any time limits at the time, the City Council indicated that the project could be developed at its own pace. Further, as a matter of law, the [County] cannot retroactively impose time limits or unilaterally rescind an entitlement like an approved discretionary permit.

. . . .

The DPP's reply letter to Gill, dated January 31, 2006, was prepared by DPP planner Mario Siu–Li (Siu–Li) and signed by Eng. The letter explained that a[ ] SEIS was not required because[,] as long as Kuilima was following the appropriate subdivision rules and regulations, the [County] was obligated to continue to process the [s]ubdivision [a]pplication. The DPP provided Gill a copy of its letter to Shafer.

[DPP Planner] Peirson explained ... that[,] when determining whether to require a[ ] SEIS, DPP looked to see if there had been any substantive changes to a project. [Planner] Siu–Li similarly stated that the reason why the DPP did not require a[ ] SEIS for the [p]roject was because "the [s]ubdivision [a]pplication was not changing the existing condition of the properties."

On March 8, 2006, the [Environmental Council] heard testimony from members of the North Shore community regarding the SEIS issue. On March 22, 2006, the Environmental Council wrote to the DPP requesting clarification as to why the [p]roject did not require a[ ] SEIS considering "the changes in timing since 1985, especially with respect to cumulative impacts and mitigative measures articulated in the original accepted [1985 EIS]." In an April 4, 2006 letter, the Department of Corporation Counsel for [the County] responded that the DPP would not comment on the Environmental Council's concerns because the issue of requiring a[ ] SEIS had become the subject of litigation.

The Environmental Council sent a follow-up letter to the DPP dated June 14, 2006, expressing the [C]ouncil's concern that the DPP was placing the burden on others to prove a[ ] SEIS was required

instead of making its own independent determination:

> The Council is concerned that DPP has not made an independent determination of whether a[ ] SEIS is required. Rather, it appears as though DPP believes that it should not require a[ ] SEIS unless some third party proves to DPP that it is required. This does not appear to be correct.

The Environmental Council also stated that[,] based on the information available to it regarding changing environmental conditions in the [p]roject over the last twenty years and changes in the [p]roject's timing and scope, it believed the DPP should require Kuilima to prepare a[ ] SEIS for the [p]roject.

As part of its subdivision review process, the DPP circulated Kuilima's [s]ubdivision [a]pplication to various interested departments and agencies of [the County] and the State of Hawai'i for review, comment, and approval. The State of Hawai'i Department of Transportation (DOT) was among the departments and agencies that reviewed the [s]ubdivision [a]pplication. The DOT accepted Kuilima's [r]oadway [i]mprovements [i]mplementation and [p]hasing [p]lan after Kuilima agreed to revise its [t]raffic [i]mpact [a]nalysis report to address the DOT's concerns. On September 29, 2006, without requiring a[ ] SEIS, the DPP tentatively approved the [s]ubdivision [a]pplication.

*Unite Here!,* 120 Hawai'i at 461–62, 209 P.3d at 1275–76 (underscored emphasis in original) (original ellipses omitted) (some brackets in original).

B. *Circuit Court Proceedings*

Two civil lawsuits were originally filed in connection with DPP's decision not to require a SEIS for the project: (1) Civ. No. 06–1–0265, filed on February 15, 2006, by Unite Here!, a labor organization representing 350 Kuilima employees, against Kuilima and the County, seeking to require Kuilima to prepare a SEIS and to enjoin DPP from processing approvals and permits for the project; and (2) Civ. No. 06–1–0867, filed on May 19, 2006 and amended on June 7, 2006, by KNSC, a Hawai'i non-profit corporation comprised of North Shore residents and/or property owners, and the Hawai'i branch of Sierra Club, a California non-profit organization, seeking declaratory and injunctive relief. Eventually, both actions were consolidated on July 17, 2006.

On August 10, 2006, the parties stipulated to dismiss with prejudice all claims and all parties in Civ. No. 06–1–0265 (the original suit brought by Unite Here!), pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 41(a)(1)(B) (2006). Thus, the only remaining claims and parties are those brought under Civ. No. 06–1–0867, *KNSC, et al. v. City & County of Honolulu, et al.* [hereinafter, the KNSC/Sierra Club action or the instant action].

In the KNSC/Sierra Club action, the plaintiffs sought (1) an injunction requiring Kuilima to prepare a SEIS pursuant to HAR §§ 11–200–26 and 11–200–27 and (2) to enjoin construction relating to the project until the SEIS was completed. Relying on the description in the 1985 EIS with respect to the timing of the project,[3] the plaintiffs essentially argued that "the [p]roject has changed 'substantively in timing, among other things,'" and that this "change in timing has had a significant effect" such that a SEIS is warranted. On June 16, and June 19, 2006, Kuilima and the County, respectively, filed an answer to the plaintiffs' complaint, generally denying the plaintiffs' allegations.

On October 11, 2006, Kuilima filed a motion for judgment on the pleadings and three motions for summary judgment. The County joined in Kuilima's motions, except for Kuilima's second motion for summary judgment.[4] *See Unite Here!,* 120 Hawai'i at 462,

---

3. As observed by the ICA, "the [p]roject was to be developed in three phases, with phase I starting in 1986, phase II starting between 1988 and 1989, and phase III starting between 1993 and 1996[,]" *Unite Here!,* 120 Hawai'i at 460, 209 P.3d at 1274, and that "the last phase [was] to be completed before 2000." *Id.*

4. Each joinder noted that the County "[did] not join in … the facts contained in said … [m]otion[s] … [to the extent that such facts] constitute legal conclusion(s), argument or otherwise attempt to characterize the actions taken by the

209 P.3d at 1276. Additionally, in response to the defendants' third motion for summary judgment, the plaintiffs filed a cross-motion for summary judgment.[5]

In their motion for judgment on the pleadings, the defendants argued, *inter alia,* that HAR § 11–200–26, *et. seq.*

> exceed[s] the statutory authority of HEPA and/or that requiring Kuilima to prepare a[ ] SEIS for the Turtle Bay expansion project would violate the plain and express language of HRS § 343–5(g) [ (Supp. 2005) ], which mandates in unequivocal terms that "[a] statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required[.]"

In their first motion for summary judgment, the defendants argued that the lawsuit was barred by the statute of limitation set forth in HRS § 343–7 (1993), quoted *infra.* In the second motion, Kuilima argued that it was entitled to summary judgment on the entirety of the plaintiffs' complaint because the subdivision application was "(1) exempt from the environmental review process[ ] and (2) non-discretionary in nature and[, thus, could] not trigger a SEIS." Finally, the defendants argued in their third motion for summary judgment that they were entitled to summary judgment as a matter of law because, based on the undisputed facts before the circuit court:

1. [The p]laintiffs have no evidence to show a "substantive change" in the [p]roject as required by HAR §§ 11–200–26 and 11–200–27;

2. [The p]laintiffs have no evidence to show "significant effects" on the environment likely "resulting from" their alleged change in the [p]roject (timing) as required by HAR §§ 11–200–26 and 11–200–27;

3. [The p]laintiffs have no evidence to show that any of the alleged environ-

mental impacts of the [p]roject that they allege resulted from a change in timing of the [p]roject were not originally disclosed or previously dealt with, as required by HAR §§ 11–200–26 and 11–200–27; and

4. Applying the "rule of reason" to DPP's decision, and considering the agency's extensive record regarding the planning and permitting process for the region in general, and for this [p]roject in particular, the DPP's decision not to require a[ ] SEIS for the [p]roject cannot be deemed either arbitrary or capricious.

The plaintiffs argued in their cross-motion for summary judgment that: (1) enforceable HEPA rules required a SEIS either when there are substantive project changes *or new circumstances and evidence* (emphases added); (2) the substantive change in the timing of the project caused, and new circumstances and evidence brought to light, increased environmental impacts to traffic and species not previously dealt with in the 1985 EIS; (3) Kuilima's subdivision application triggered HEPA's supplemental review; and (4) DPP did not take a hard look at the new circumstances and evidence and, thus, violated HEPA when it decided that Kuilima was not required to prepare a SEIS. With respect to timing, the plaintiffs specifically argued that "the passage of time, especially when it is more than twenty years, is relevant and must be considered in light of the very low threshold for requiring a[ ] SEIS under Hawai'i law." On November 3, 2006, the defendants each filed a memorandum in opposition to the plaintiffs' cross-motion for summary judgment.

### 1. Defendants' Evidence in Support of Third Motion

In support of the third motion for summary judgment, the defendants, pursuant to HRCP 56(e) (2006),[6] attached parts of the

---

[County] with regard to the issuance of land use approvals/permits."

**5.** The circuit court focused only upon the third motion and cross-motion for summary judgment and, as reported *infra,* ruled that the remaining

motions were rendered moot by its grant of summary judgment in favor of the defendants.

**6.** HRCP 56(e) states, in relevant part, that:
> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth

1985 EIS and the KDC unilateral agreement. With respect to the 1985 EIS, the defendants pointed to the following specific language contained therein, which stated:

D. *PHASING AND TIMING OF THE ACTION*

Figure 9 shows the approximate phasing of development for the resort (phasing is dependent on receiving the necessary governmental approvals). Note that Phase I designation generally indicates a 1986 start of construction date, Phase II, commencement between 1988 to 1989, and Phase III, [c]ommencement between 1993 to 1996.

With respect to the unilateral agreement, the defendants pointed to a provision therein, which stated in relevant part:

3. Development of the project shall generally be based on the submitted schedule [ (which is the same as the one referenced in the 1985 EIS).] Development may deviate from this schedule due to the occurrence of changed economic conditions, lawsuits, strikes or other unforseen [sic] circumstances.

**2. Plaintiffs' Evidence in Support of Cross–Motion**

The following relevant evidence was submitted by the plaintiffs in support of their cross-motion for summary judgment, pursuant to HRCP 56(e):

a. *the 1985 EIS*

Relying on the same provision from the 1985 EIS cited by the defendants, *i.e.*, "D. *PHASING AND TIMING OF THE ACTION*," quoted above, the plaintiffs argued that the timing condition was inherent within the 1985 EIS itself. Additionally, the plaintiffs maintained that the entirety of the 1985 EIS was based on evidence available in 1985—over twenty years ago.

such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and sup-

b. *DPP's SEIS procedures*

Regarding DPP's SEIS procedures, the plaintiffs submitted the depositions of (1) Arthur Challacombe, "the person designated by the [County] as the most knowledgeable on the obligations of the County['s] DPP to enforce the State of [Hawaii's] environmental rules and regulations," (2) Mario Siu–Li, DPP's senior planner, and (3) James Peirson, another DPP planner. With respect to how DPP obtains its evidence to aid in determining whether to require a SEIS, Challacombe stated that, "if there's evidence submitted to [DPP,] we will review the evidence. If ... we have no evidence, then we have nothing to ... base a determination on." Challacombe noted that there must be some sort of development trigger, *i.e.*, "if ... the condition of the SMP called for X ... units and the building permit application doubles that, ... that would cause concern and give us evidence that we need to look at further." He further emphasized that, "if everything's the same, if nothing's changed, then we have no evidence and no need to require or ask for a [SEIS]." Siu–Li similarly testified that "normally the inquiry [DPP] make[s]" is whether "the project conforms to the approved permit." According to Peirson, who drafted the response letter on behalf of Eng to Shafer, one of the concerned citizens requesting a SEIS:

[E]very time a permit comes in, it isn't a standard question that needs to be asked, hmm, does a [SEIS] have to be done.

We will examine the impacts associated with the request, determine what agencies that have expertise in-certain matters need to review it to let us know whether there's issues that we need to be concerned about that might have changed or things that

ported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

might be necessary or impacts that need to be mitigated.

And when we get that kind of feedback, then we have an opportunity to ... take action, for instance, such as requiring a [SEIS] or requiring additional studies or reports and things like that.

With regard to the DPP's process to determine whether to require supplemental review, Challacombe testified:

> Q. [By the plaintiffs' counsel] [W]ould[ ] you look at the cumulative to see what's ... been built around the subdivision to determine the cumulative impacts of something before you grant the subdivision application?
>
> A. [By Challacombe] I would look at the cumulative impact of the project on the community, not the other way around.
>
> Q. Okay, but in doing that, you'd have to know what the community is at the time, right, you're looking at?
>
> A. That's correct.
>
> Q. And ... the DPP wouldn't have done that unless somebody came to them with evidence that the community has changed in some way since the original [permit or application] was granted ... ?
>
> A. I wouldn't do it.... *If the project doesn't change, if the project is the same that was what was approved, then there is no evidence of cumulative impact.*
>
> . . . .
>
> Q. In your experience, have there been other projects where the SMP and unilateral agreement had been approved, but the project wasn't initiated for another 20 years[.]
>
> I'm just trying to find out if there's any limits on this—... I understand this is your opinion, that time is irrelevant.
>
> A. *Timing is one of the components in ... the review. It is important. It is not the sole criterion.*
>
> Q. And is it your understanding, though, that then 20 years just by itself is not sufficient to trigger some thought, gee, maybe things have changed a little bit and we ought to come investigate?

> A. *If the project hasn't changed, then the project hasn't changed so there are no new impacts.*
>
> Q. Unless the surrounding community has changed, right? There might be if the surrounding community has changed, no?
>
> A. *If the surrounding community's changed, we would consider that,* but we ... would need the evidence.
>
> Q. And you would wait for somebody to present evidence to you, rather than go out and look and see if the surrounding community has changed?
>
> A. In terms of the building permit, again, we would compare. We would take that into account. Again, I go back to the traffic study. *We, I am sure, are going to require an updated traffic study at the time of building permit application for the Kuilima development.*
>
> *A twenty year old traffic study is not sufficient, because* as you pointed out, *there may be factors in the community that have changed, i.e., traffic.*

(Emphases added.)

With respect to the review process in the instant case, Siu–Li indicated that, in drafting his response to Gill, the other concerned citizen and an officer of Unite Here!, requesting a SEIS, his initial assumption was that no SEIS would be necessary, and, as a result, he relied on the past determination of a SMP and his colleague's (Peirson's) response letter to Shafer. He further indicated that he did not go back and review the 1985 EIS and, thus, was not fully apprised of its contents nor did he review the original SMP. Addressing the changes that have occurred over the twenty years since the 1985 EIS, Siu–Li testified:

> Q. [By the plaintiffs' counsel] Did you have a question in your mind ... before you drafted that letter [to Gill], whether or not the delay of almost 20 years might have a significant impact on the environment or surrounding community?
>
> . . . .
>
> A. [By Siu–Li] No, I didn't. But like I said, we had some discussions before drafting the letter, and *the consensus was that*

*the passing of the time by itself alone would not necessarily trigger a [SEIS].*

. . . .

Q. [B]efore your letter of January, are you aware of any consideration given by DPP as to whether or not the surrounding community had changed in the 20–year period?

A. Well, you know, *everything has changed in 20 years.* I mean, *that's without even saying.* You know, *whether the project itself has changed, that's something that has not been shown to us.*

(Emphases added.) Peirson also testified with respect to the timing of the project as follows:

Q. [By the plaintiffs' counsel] Wasn't there a projected phasing [indicated in the 1985 EIS] to be finished with the project by 1996?

A. [By Peirson] There was, I think, one sentence in the EIS that had a proposed phasing, followed by a footnote or a second sentence that qualified that phasing.

But what I would explain to you, as a matter of reading what the entitlement is, there's a difference between what an applicant proposes and what the council disposes in terms of an authority.

If they don't adopt the phasing as a condition of the approval, it doesn't matter what might have been proposed. There was no phasing required as a condition of its approval; and therefore, *the passage of time itself could not constitute a substantive change to the project.*

Q. Could not, you said?

A. *Not under the authority granted by that particular permit.*

Q. *And you don't believe that it could ever require another review under Chapter 343?*

A. Are you asking *simply because of the passage in time?*

Q. Let's start there. Yes.

A. *No.*

(Emphases added.)

c. *evidence of "significant changes"*

i. **traffic studies**

The plaintiffs enlisted the services of Tom Brohard, a professional engineer, and sub-mitted his declaration, as well as his October 2006 review of traffic studies for the Turtle Bay resort expansion project on the North Shore of Oʻahu. In his review, Brohard asserted that "[a]n appropriate traffic impact analysis of the [project] has not been conducted as of this date." Acknowledging the existence of various documented traffic studies for the project area—including those prepared in 1985, 1991, and 2005, discussed *supra,*—Brohard opined that such reports "do not match the EIS project description" and "contain fundamental errors in methodology." He stated that "[t]he 1985 Report is outdated[,] and there are numerous errors, conflicts, and omissions throughout the 1991 Report and the 2005 Report[.]"

Brohard explained:

The traffic analyses for the [project] have used a lessening annual background growth rate from 4% in 1985 to 3.5% in 1991 to 2.7% in 2005. Reducing the background growth rate is contrary to a number of factors including the significant increase in the number of vehicle registrations on Oʻahu and increased visitor trips to the North Shore created by factors such as the increasing popularity of observing basking sea turtles and the proliferation of surfing schools catering to tourists. Each of these has contributed to the increase in traffic at Turtle Bay, with half of the overnight Waikiki visitors in 2005 traveling to the North Shore during their Oʻahu stay.

None of the traffic analyses have quantified vehicle trips generated by "pipeline development" in the study area. Certainly, a number of projects have been approved but not yet constructed or fully occupied. There are also others that are "reasonably foreseeable" in the next 15 to 25 years. Trips to and from "pipeline development" must be included in the base traffic volumes before trips for the [project] are added and analyzed.

The flawed approach used in each traffic study significantly underestimates future base volumes. The revised evaluation must include vehicle trips from "pipeline

development" that come on line as the major phases of the [project] are occupied. All planned and funded road improvements assumed to be in place at each project phase must also be identified.

Failing to identify the proper baseline traffic volumes could certainly result in the failure to disclose significant traffic impacts when project traffic is added to the [project]. The future baseline traffic forecasts must be corrected and each of the resulting significant project traffic impacts must be identified, analyzed[,] and mitigated.

### ii. monk seals and other species

The plaintiffs submitted a July 5, 2006 report prepared by marine biologist Jason Baker on behalf of the Pacific Islands Fisheries Science Center pursuant to the plaintiffs' June 2006 Freedom of Information Act request. Baker's report "summarize[d] all documented sightings of Hawaiian monk seals in the area of Turtle Bay resort, between Kawela Bay and Kahuku Point," as well as all monk seal births at or near the project site. Since the early 1980s, monk seal sightings at and around the project area were sporadic. Sightings were reported in 1984 and 1991. The record indicates no sightings between 1985 and 1989 nor between 1997 and 1999. In 2001, monk seal sightings at or around the project area began to increase, with three sightings in 2001 and 2002, six in 2003, nine in 2004, twenty-one in 2005 and fifty four in 2006. According to Baker's report, "[sixty-nine] of [the] 101 [documented] seal sightings [since 1984] are attributable to [eleven] known individual[ seals]," "[f]ive of [which] are adult females who are documented to have given birth and nursed their pups on remote beaches on Kaua'i, Moloka'i, Hawai'i, Ni'ihau, Rabbit Island, and O'ahu." As of this report:

> [a] single birth has been recorded in [the project] area. A pup was born on Kaihalulu Beach, on the Kahuku side of the resort, on June 1, 2006, and the mother and nursing pup are currently in the area as of July

3, 2006, along the beach or in nearshore waters. The nursing period generally lasts [five to seven] weeks. Although not in the immediate area of interest, a second birth was documented at nearby Waiale'e Beach Park on March 15, 1991.

The plaintiffs also referenced three water quality reports administered by Kuilima in 1989 that summarized observations of green sea turtles over periods of five days during daylight hours only. These reports indicated that, in July 1989, no more than three turtles were observed simultaneously in one time interval. The October 1989 report estimated a maximum of nine turtles in the bay during morning hours. In December 1989, there was an average of about ten turtles in the bay during early morning hours and three or four turtles in the bay during the mid-day and afternoon hours.

### 3. Defendants' Evidence in Opposition to Plaintiffs' Cross–Motion

In opposition to the plaintiffs' cross-motion for summary judgment, the defendants pointed to, *inter alia*, other portions of Challacombe's deposition testimony regarding the DPP's SEIS procedures, both in general and specifically as to Kuilima's project:

> Q. [By the plaintiffs' counsel] When[,] . . . based on your understanding, would a [SEIS] be required for a project that involves a[ ] SMP [7] or a unilateral agreement?
>
> A. [By Challacombe] *When the scope of the project has changed, the size has changed, density.* Whenever there's a significant—*as per the [HEPA] rules, whenever there's a significant change in the development.*
>
> Q. How about *the timing of the development?*
>
> A. *That's a component, but it's not necessarily the only thing. [I]t's everything. Again, size, scope, you know, it could be the timing, but it's not necessarily.* Nowhere—

---

**7.** Challacombe indicated that the review of a subdivision application is the same as the review for a SMP or building permit, etc.

Q. It could be any one of those, though, right?

A. It could be, yes.

Q. That would trigger a [SEIS]?

A. It could be. *Again, the key wording is significant impact. [A] significant impact would result from the change in the scope, timing, so forth.*

Q. So is that your understanding of the DPP's view of this, is that a [SEIS] is not necessary for a project that has a[ ] SM[P] or a unilateral agreement unless there will be a significant impact . . . in some area?

A. Yes.

Q. And it's not may, it's will?

A. May. No, it's may.

Q. It's may?

A. Yes. It specifically says that in the rules.

. . . .

Q. So it's not necessarily somebody coming in saying that this will have an impact, *it's somebody looking at it to say may this have an impact or not, correct?*

A. *That's correct.*

(Emphases added.)

### 4. Plaintiffs' Reply Evidence in Support of Cross–Motion

In further support of their cross-motion for summary judgment, the plaintiffs submitted evidence in their November 8, 2006 reply memorandum, regarding new information about monk seals in the project area that was not. previously available. Specifically, the plaintiffs deposed Charles Littnan, Ph.D. (Dr. Littnan), a marine mammal ecologist who has studied the habitat requirements, diet, and feeding behavior of the Hawaiian monk seal for over ten years. According to Dr. Littnan, both the beach and near shore areas of the project are now known to be a foraging habitat to the monk seal population, the beach has been identified as an important "hauling out habitat," [8] and the first recorded pupping of Hawaiian monk seals in the project area occurred on June 1, 2006. Dr. Littnan stated that "the numerous recently

reported sightings of monk seals in the area suggest that the beaches and near shore areas of the [p]roject are critical to the regeneration of the monk seal population" because

there are numerous beaches on [O'ahu] which have had no reported sightings of monk seals on them, indicating that some beaches are not attractive to monk seals. Several seal species have been shown to have preference for particular beach characteristics (*e.g.*[,] slope, exposure to swells, substrate [sand or rock], proximity to feeding areas), so it is reasonable to believe monk seals have similar criteria in their choice of beach. Further, the fact that multiple seals have used this area indicates that there is something that is causing them to select it specifically.

As a result, Dr. Littnan stated that he "expect[s] that the number of pups born in the main Hawaiian [i]slands will continue to increase each year for the foreseeable future, and[,] assuming there are no changes in the conditions of the [r]esort [a]rea, it is very likely that the monk seals will continue to use the . . . [a]rea as a habitat for pupping." Dr. Littnan further testified that, although the project area is not currently designated as a critical habitat, "the last critical habitat assessment for Hawaiian monk seals was performed prior to the increased presence of monk seals in the [m]ain Hawaiian [i]slands, [and] it cannot be assumed that the [p]roject area will not be so designated in the future."

### 5. Circuit Court's Decision

On November 13, 2006, a hearing on the parties' respective motions for summary judgment was held. After considering the arguments made and the evidence submitted by the parties, the circuit court entered an order on December 5, 2006, granting Kuilima's third motion for summary judgment and the County's joinder and denying the plaintiffs' cross-motion for summary judgment. The circuit court essentially agreed with the defendants' interpretation of HAR §§ 11–200–26 and 11–200–27 that a SEIS is

8. According to Dr. Littnan, "[m]onk seals haul out on beaches for three reasons: to rest, molt, and pup. Although resting seals may haul out for short periods, molting seals may haul out for a week or more and mother-pup pairs may occupy a beach for a month or longer."

required *only* when there is a substantive project change and determined that, as a matter of law, the timing of the project had not substantively changed. As previously noted, the circuit court, based upon its grant of summary judgment in favor of the defendants, ruled that the defendants' motion for judgment on the pleadings and the other two motions for summary judgment were moot. Also, on December 5, 2006, the circuit court entered the following relevant findings of fact (FOFs) and conclusions of law (COLs):

[FOFs]

1. [HRS] § 343–5(g) [ (Supp.2005) ] provides that an [EIS] that is accepted with respect to a particular action shall satisfy the requirements of the chapter and no other statement for that proposed action shall be required.

2. [HEPA] allows the Environmental Council to draft rules and regulations to implement HEPA[.]

3. An EIS is supposed to be prepared, and environmental consequences of an action are supposed to be reviewed, at the earliest possible time. *See* HRS § 343–5(b). The [c]ourt finds that this was done with respect to the [project] in 1985. The EIS for the [p]roject was accepted in October 1985, and is a matter of public record.

4. Although there has been some delay in the [p]roject from the community's perspective, there have been ongoing activities and actions with respect to the [p]roject throughout the past [twenty] years. In addition, the [p]roject was adopted as part of the Koʻolauloa Sustainable Communities Plan in May of 1999; the public had an opportunity to participate with respect to the adoption of that [p]lan.

5. The [DPP], as the accepting authority, is responsible for determining whether a [SEIS] is required for the [p]roject. *See* HAR § [ ] 11–200–27.

6. At the end of 2005 and beginning of 2006, certain North Shore neighborhood boards ... and other individuals asked the DPP whether the timing of the [p]roject would require a [SEIS]. The [p]laintiffs did not write any of those letters. The DPP responded, indicating that it had determined that a [SEIS] was not required for the [p]roject. Although it does not appear that specific reasons were given, the DPP determined that the timing of the action has not changed so as to require a [SEIS].

7. The ... 1985 EIS contained only general statements in terms of phasing of the [p]roject, but those statements did not impose a time limit on the [p]roject based on that proposed phasing time frame. The ... 1985 EIS does not obligate Kuilima to follow that phasing time frame.

8. The law provides that when you have a project that is to be constructed in phases, the original EIS covers everything, and the project is the action under consideration. *In this case, the [p]roject is the "action." There has been no change to the action that would essentially make it a new action under consideration.*

[COLs]

1. The law provides that courts are supposed to give deference to the expertise of agencies that deal with administrative issues. The [circuit c]ourt is not to substitute its judgment for the judgment of an agency. If the decision of the agency meets the "rule of reason" and the decision is not "arbitrary or capricious," the [circuit c]ourt shall not substitute its judgment for that of the agency.

2. The DPP's decision that a [SEIS] is not required for the [p]roject meets the rule of reason standard[ ] and was not arbitrary or capricious. *The timing of the [p]roject has not substantively, or essentially, changed. In the alternative, even if the timing had substantively changed, which the [circuit c]ourt finds that it has not, such change is not likely to have a significant effect.*

3. [The p]laintiffs' concerns that form the basis of their claims in this litigation were basically expressed for the first time in the filings before this [c]ourt. However, even if the [circuit c]ourt were to review those concerns, *the [circuit c]ourt would not find that there is a substantive change likely to result in a significant effect not*

*originally considered or previously dealt with that would require a[ ] SEIS.*

(Emphases added.)

On June 4, 2007, the circuit court entered its amended final judgment [9] in favor of the defendants and against the plaintiffs on all of the plaintiffs' claims set forth in their first amended complaint. The plaintiffs filed a timely notice of appeal on June 19, 2007.

### C. Appeal Before the ICA

On direct appeal, the plaintiffs contended that the circuit court erred in (1) granting the defendants' third motion for summary judgment and (2) denying the plaintiffs' cross-motion for summary judgment. The plaintiffs argued, as they did before the circuit court, that a SEIS is required in this case because the timing of the project has substantially changed. Specifically, they argued that "the 1985 EIS and 1985 [t]raffic [r]eport [we]re 'outdated' and '[could not] be relied upon to properly disclose, analyze, and mitigate the significant local and regional . . . impacts of the [project]." More specifically, the plaintiffs argued, *inter alia*, that they were entitled to judgment as a matter of law because "HEPA applie[d] to [Kuilima]'s application for a preliminary subdivision," and, thus, DPP had "an obligation, implied in HEPA and express in [HAR §§ 11–200–26 and 11–200–27]" to make an " 'independent determination' whether new circumstances and evidence require[d] a SEIS." The plaintiffs additionally contended that, inasmuch as the DPP did not take a "hard look" at whether "new circumstances or evidence have

9. The amended final judgment is identical to the original except that the amended version added the language, "[a]ny remaining parties and/or claims are dismissed."

10. On March 17, 2008, *amicus curiae* Conservation Council for Hawai'i [hereinafter, Conservation Council] filed an amicus brief in support of the plaintiffs' position.

11. The County appears to have abandoned these arguments on appeal.

12. HAR § 11–200–26 states:

A statement that is accepted with respect to a particular action is usually qualified by the size, scope, location, intensity, use, and timing of the action, among other things. *A statement*

brought to light different or likely increased environmental impacts [from the project] not previously dealt with," its decision was not in accordance with the "rule of reason," *i.e.,* it was arbitrary and capricious.[10]

In response, the defendants argued that a SEIS was not required for the project because "[the] plaintiffs misinterpret[ed] and misappl[ied] the SEIS rules[ ] and have not met their burden" of showing a substantive change in the "project itself." Additionally, Kuilima argued that, in any event: (1) "[the] plaintiffs' claims [were] time-barred under HRS § 343–7," quoted *infra;* (2) the Environmental Council exceeded its statutory authority in promulgating HAR §§ 11–200–26 and 11–200–27 and, "accordingly[,] no cause of action exist[ed] to require Kuilima to prepare a[ ] SEIS"; (3) Kuilima's subdivision application was not an " 'action' under HEPA" and, thus, did not "trigger [DPP's] obligation to determine if a[ ] SEIS should be required." [11] Finally, the defendants contended that DPP did, in fact, take a "hard look" at the project and, thus, its decision was not arbitrary and capricious.

### 1. The ICA Majority

The ICA issued its published opinion on May 22, 2009, and, as discussed more fully *infra,* a majority of the court concluded that, pursuant to HAR § 11–200–26,[12] "the DPP is required to conduct a two-step inquiry to determine whether a[ ] SEIS is required," *Unite Here!,* 120 Hawai'i at 465, 209 P.3d at 1279, specifically:

that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required, **to the extent that the action has not changed substantively in size, scope, intensity, use, location or timing, among other things.** If there is any change in any of these characteristics which may have a significant effect, the original statement that was changed shall no longer be valid because an essentially different action would be under consideration and a supplemental statement shall be prepared and reviewed as provided by this chapter. As long is there is no change in a proposed action resulting in individual or cumulative impacts not originally disclosed, the statement associated with that action shall be deemed to comply with this chapter.

(Emphases added.)

(1) *Whether the action (the [p]roject) has changed substantively* in size, scope, intensity, use, location or timing? *And if so,*

(2) Will the change in any of these characteristics likely have a significant effect and result in individual or cumulative impacts not originally disclosed in the EIS?

*Id.* (emphases in original). With respect to the two-part inquiry, the ICA reasoned that:

If the DPP answers the first question in the negative, no further inquiry is necessary as "no other statement [for the [p]roject] will be required." If the DPP answers the first question in the affirmative (*i.e.*, finding there is a substantive change in one of the aforementioned characteristics), then the DPP is required to determine whether the change will likely have a "significant effect" and result in "individual or cumulative impacts not originally disclosed" in the original EIS.

*Id.* (citations omitted) (some brackets in original). In other words, the ICA majority determined that "there *must be a substantive change* in the action (the [p]roject) before a[ ] SEIS is to be considered." *Id.* (emphasis in original). The ICA concluded that: (1) "[t]he [1985 EIS] detailed only an 'approximate phasing of the development for the resort[,]' " *id.* at 466, 209 P.3d at 1280; (2) "[n]either the [1985] EIS nor the governmental entities imposed a timing condition[,]" *id.*; and (3) "there was no substantial change in the [p]roject." *Id.* The ICA also concluded that a SEIS was not required because the subdivision application did not constitute an "action" under HEPA and that, therefore, the 1985 EIS "covered the entire [p]roject, including the [s]ubdivision [a]pplication." *Id.* at 467, 209 P.3d at 1281. Consequently, the

ICA affirmed the circuit court's amended final judgment in favor of the defendants. *Id.* The ICA did not specifically address Kuilima's contentions that the plaintiffs' claims were time-barred under HRS § 343–7 or that subdivision application was exempt from HEPA; nor did it review the defendants' contention that the Environmental Council exceeded its statutory authority in promulgating HAR §§ 11–200–26 and 11–200–27.

## 2. The ICA Dissent

The dissent agreed with the plaintiffs' interpretation of HEPA and HAR §§ 11–200–26 and 11–200–27,[13] concluding that a SEIS is required

when significant changes to the anticipated environmental impacts of a proposed action become apparent such that "an essentially different action" is being proposed. Significant changes to the anticipated environmental impacts of a development project can arise from changes to the design of the project itself, changes to conditions surrounding the project, or the discovery of new information. In my view, [HEPA and its rules] do not restrict the responsible agency by only permitting it to consider changes to a project's anticipated environmental impacts when the design of a project itself has changed. Rather, in determining whether a[ ] SEIS is warranted, . . . the agency is authorized to consider not only the potential effects of design changes to the project, but whether changes to the conditions surrounding the project and newly discovered information may significantly affect the project's anticipated environmental impacts.

*Id.* at 468, 209 P.3d at 1282 (Nakamura, J., dissenting). The dissent considered the overriding purpose of HEPA—*i.e.*, "to en-

---

**13.** HAR § 11–200–27 states:

The accepting authority or approving agency in coordination with the original accepting authority shall be responsible for determining whether a supplemental statement is required. This determination will be submitted to the office for publication in the periodic bulletin. Proposing agencies or applicants shall prepare for public review supplemental statements whenever the proposed action for which a statement was accepted has been modified to the extent that new or different environmental

impacts are anticipated. *A supplemental statement shall be warranted when the scope of an action has been substantially increased, when the intensity of environmental impacts will be increased, when the mitigating measures originally planned are not to be implemented, or where new circumstances or evidence have brought to light different or likely increased environmental impacts not previously dealt with.*

(Emphasis added.)

sure that an agency is provided with relevant information about the environmental impacts of a proposed project so that the agency can make informed decisions about the project," *id.* at 471, 209 P.3d at 1285 (citing HRS § 343-1 (1993))—and concluded that "[a] proposed project can become 'an essentially different action' in terms of its environmental impacts due to changed circumstances surrounding the project or the discovery of new information, even if the project's design has not changed." *Id.* The dissent additionally reasoned, as discussed *infra*, that "absurd results" would stem from the majority's interpretation of HEPA and HAR §§ 11-200-26 and 11-200-27. *Id.* at 472, 209 P.3d at 1286. Thus, the dissent concluded that, "[b]ecause of its erroneous view of the law, the DPP failed to consider appropriate factors and follow correct procedures in deciding not to require a[ ] SEIS." *Id.* at 474, 209 P.3d at 1288.

The ICA filed its judgment on appeal on June 12, 2009. The plaintiffs filed a timely application for a writ of certiorari on September 8, 2009.[14] Thereafter, this court accepted the plaintiffs' application on October 13, 2009 and heard oral argument on December 17, 2009.[15]

## II. STANDARDS OF REVIEW

### A. Summary Judgment

■ An appellate court "review[s] an award of summary judgment under the same standard applied by the circuit court." *Yoneda v. Tom*, 110 Hawai'i 367, 371, 133 P.3d 796, 800 (2006) (citation omitted). Thus, this court reviews the circuit court's grant or denial of summary judgment *de novo*. *Sier-* *ra Club v. Dep't of Transp.*, 115 Hawai'i 299, 312, 167 P.3d 292, 305 (2007). Moreover,

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* at 313, 167 P.3d at 306 (citations omitted).

### B. Statutory Interpretation

■ This court has established the following principles for interpreting a statute:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by exam-

---

14. On September 11, 2009, Earthjustice, a non-profit environmental law firm, filed an amicus curiae brief in support of the plaintiffs' application on behalf of a number of citizen groups. Citizen groups represented by Earthjustice include the Conservation Council, Surfrider Foundation, Hawaii's Thousand Friends, Life of the Land, Maui Tomorrow Foundation, and KAHEA.

15. Five additional amicus briefs were filed after this court accepted the plaintiffs' application. One, in support of the plaintiffs' position, was filed by Defend O'ahu Coalition. Three were filed in support of the defendants' positions, to wit: (1) North Shore Career Training Corporation, Laie Community Association, and Kahuku Community Association [hereinafter, collectively, North Shore Associations]; (2) First Hawaiian Bank; and (3) the Land Use Research Foundation of Hawai'i (LURF), Hawai'i Developer's Council (HDC), and Hawai'i Leeward Planning Conference (HLPC) [hereinafter, collectively, LURF amici]. The fifth amicus brief was filed by Dr. Nui Loa Price, wherein he essentially argues that this court should consider Hawaiian history and federal Indian law in making its land use decisions.

ining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Awakuni v. Awana,* 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007) (citation omitted). This court has also instructed that statutory language must be read "in the context of the entire statute and construe[d] in a manner consistent with its purpose." *Hous. Fin. & Dev. Corp. v. Castle,* 79 Hawai'i 64, 77, 898 P.2d 576, 589 (1995) (citation omitted). The same general principles that apply to statutory interpretation also apply to interpretation of administrative rules. *Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 454, 99 P.3d 96, 105 (2004) (citation omitted).

### C. *Conclusions of Law*

 "A COL is not binding on an appellate court and is freely reviewable for correctness. Thus, the court reviews COL de novo, under the right/wrong standard." *Kapuwai v. City & County of Honolulu,* 121 Hawai'i 33, 39, 211 P.3d 750, 756 (2009) (citation omitted). Statutory interpretation is "a question of law reviewable de novo." *Awakuni,* 115 Hawai'i at 132, 165 P.3d at 1033.

### D. *Agency Decisions*

 The issue of what standard to apply when reviewing an agency's decision whether a SEIS is required presents a question of first impression in this jurisdiction. This court, however, has reviewed an agency's determination whether an EIS satisfies the applicable statutory requirements under the "rule of reason" standard. *See Price v. Obayashi Hawai'i Corp.,* 81 Hawai'i 171, 182, 914 P.2d 1364, 1375 (1996). As applied to consideration of the adequacy of an EIS, this court has stated:

> In making such a determination[, a] court is guided by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision

after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*Id.* (quoting *Life of the Land v. Ariyoshi,* 59 Haw. 156, 164–65, 577 P.2d 1116, 1121 (1978) (citation omitted)) (footnote omitted).

 Moreover, this court has recognized that "[a] court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, the court must ensure that the agency has taken a 'hard look' at environmental factors," and, "[i]f the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be 'arbitrary and capricious,' given the known environmental consequences." *Id.* at 182 n. 12, 914 P.2d at 1375 n. 12 (relying on federal case law).

## III. *DISCUSSION*

The plaintiffs primarily contend before this court that the ICA majority erred in interpreting HEPA and HAR §§ 11–200–26 and 11–200–27 "to mean that an agency may order a supplemental review *only* when there has been a substantive change in the *design* of a project" and essentially argue that a SEIS is warranted when the project has changed "substantively in size, scope, intensity, use, location, or timing." HAR § 11–200–26. In response, Kuilima raises two threshold issues that must be addressed prior to reaching the plaintiffs' contentions, to wit: (1) whether the plaintiffs' claims are time-barred by the applicable statute of limitations and (2) whether the Environmental Council exceeded its statutory authority in promulgating the administrative rules regarding SEISs.

### A. *Statute of Limitations*

As previously indicated, the circuit court ruled that Kuilima's first motion for summary judgment based on statute of limitations grounds, which was joined in by the County, was moot in light of its grant of summary judgment in favor of the defendants. Although the statute of limitations ground was reasserted on appeal before the

ICA, neither the ICA majority nor the dissent addressed this threshold issue. In response to the plaintiffs' application, Kuilima again argues that the plaintiffs' claims are untimely because the plaintiffs' complaint was filed more than 120 days after "the [p]roject started or allegedly 'restarted' and when [the plaintiffs] knew or reasonably should have known of the alleged change in the timing of the [p]roject or the 'new circumstances or evidence.'" Alternatively, Kuilima argues that the plaintiffs' claims are time-barred because: (1) the plaintiffs filed the complaint more than thirty days "after [the plaintiffs] had actual knowledge of the DPP's determination that a[ ] SEIS was not required"; and (2) the plaintiffs filed the complaint "more than sixty days after [the plaintiffs] had actual knowledge of the DPP's determination that a[ ] SEIS was not required."

■■■ HEPA does not provide limitation periods for actions specifically related to *supplemental* assessments. However, it appears undisputed, based on the arguments of the parties, that the limitation periods applicable to EISs are the same for SEISs. Such treatment is seemingly supported by the administrative rules promulgated to further the purpose of HEPA that generally subject EISs and SEISs to some of the same procedural requirements. *See* HAR § 11–200–28 (indicating that the contents of a SEIS "shall be the same as required by this chapter for the EIS"); HAR § 11–200–29 (listing certain procedural requirements, including filing public notices, distribution, and acceptance procedures, and indicating that such procedures "shall be the same for the supplemental statement as is prescribed by this chapter for an EIS"). Thus, pursuant to HRS § 343–7, the statute of limitations for actions related to an EIS—and, consequently, a SEIS—is as follows:

(a) Any judicial proceeding, the subject of which is the lack of [an environmental] assessment required under section 343–5, [Supp.2005 [16]] shall be initiated *within one hundred twenty days of the agency's deci-*

sion to carry out or approve the action, or, *if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started.* . . .

(b) Any judicial proceeding, the subject of which is the determination that a statement is required for a proposed action, shall be initiated within sixty days after the public has been informed of such determination pursuant to [HRS] section 343–3 [ (Supp.2005) (pertaining to public records and notice) ]. Any judicial proceeding, *the subject of which is the determination that a statement is not required* for a proposed action, *shall be initiated within thirty days after the public has been informed of such determination pursuant to section 343–3* . . . .

(c) Any judicial proceeding, the subject of which is *the acceptance of an [EIS]* required under section 343–5, *shall be initiated within sixty days after the public has been informed pursuant to section 343–3 of the acceptance of such statement.*

(Emphases added.) Inasmuch as the issue here is the DPP's determination that an *environmental assessment was **not** required,* subsection (c) above, relating to judicial proceedings involving "the acceptance of an EIS," clearly does not apply.

■■■ On the other hand, subsection (b)'s limitation period applies to those judicial proceedings related to whether a statement is or is not required and is, thus, seemingly applicable. For circumstances where the determination involves a statement that is not required, as here, judicial proceedings "shall be initiated within thirty days after the public has been informed of such determination pursuant to [HRS] section 343–3." HRS § 343–7(b). HRS § 343–3 provides in relevant part:

(a) All statements, environmental assessments, and other documents prepared under this chapter shall be made available

---

16. HRS § 343–5, entitled "Applicability and requirements," describes the circumstances under which an environmental assessment is required

and related requirements for the environmental review process.

for inspection by the public during established office hours.

(b) The [OEQC] shall inform the public of *notices filed by agencies* [ (*e.g.*, the DPP) ] of the availability of environmental assessments for review and comments, *of determinations that statements are* required or *not required*, of the availability of statements for review and comments, and of the acceptance or nonacceptance of statements.

(Emphases added.) With respect to "notices filed by agencies" referred to above, HAR §§ 11–200–11.1 (relating to "Notice of Determination for Draft Environmental Assessments") and 11–200–11.2 (relating to "Notice of Determination for Final Environmental Assessments"), which are nearly identical, provide in relevant part that,

> if the ... approving agency [ (here, the DPP) ] anticipates that the proposed action is not likely to have a significant effect, it shall issue a notice of determination which shall be an anticipated *negative declaration*[17] subject to the public review provisions of section 11–200–9.1 [ (setting forth procedures for public review and comment in negative declaration determination situations) ]. The ... approving agency *shall also file such notice with the [OEQC] as early as possible after the determination is made[.]*

HAR § 11–200–11.1 (emphases added).[18] A review of the record reveals no evidence demonstrating that the DPP filed a notice of its determination that a SEIS was not re-

quired with the OEQC, and Kuilima fails to identify any such evidence. Inasmuch as the requisite notice was not provided, there is no date from which to measure the thirty day limitation prescribed by HRS § 343–3(b). Consequently, we conclude subsection (b) is inapplicable under these circumstances.

Kuilima, however, in attempting to convince this court that subsection (b) applies, essentially contends that the plaintiffs' actual knowledge may substitute for the public notice and argues (in a footnote) that, "[i]n cases where formal publication does not occur, the statute of limitations runs from the date of 'actual knowledge.'" (Citing HRS § 91–2 (1993).[19]) Specifically, Kuilima points to various instances when "[m]embers of KNSC [allegedly] admitted to having 'actual knowledge,'" including, *inter alia*, (1) Shafer's receipt of DPP's January 19, 2006 response letter, indicating that a SEIS was not required, (2) KNSC director Gilbert Riviere's attendance at the February 9, 2006 Koʻolau Loa Neighborhood Board Meeting when the DPP's February 8, 2006 letter was allegedly read aloud, and (3) "at the very latest," KNSC members' attendance at a March 15, 2006 Sunset Neighborhood Board meeting when Gill allegedly reported DPP's response.

Kuilima's citation to the general provision set forth in HRS § 91–2, quoted *supra* at note 19, and its conclusory statement that, absent formal publication, the statute of limitations runs from actual notice is unpersuasive. As discussed above, the statute of limitations set forth in HRS § 343–7(b) specifically provides that judicial proceedings

---

**17.** A "negative declaration" or "finding of no significant impact" is defined as "a determination by an agency based on an environmental assessment that a given action ... does not have a significant effect on the environment and therefore *does not require the preparation of an EIS*," or, as here, the preparation of a SEIS. HAR § 11–200–2. "A negative declaration is required prior to implementing or approving the action." *Id.*

**18.** Pursuant to HAR § 11–200–3,
 A. The [OEQC] shall inform the public through the publication of a periodic bulletin of the following:
 ...;
 2. *Notices filed by agencies of determinations that statements are* required or *not required;*

 ....
 C. The bulletin shall be issued on the eighth and twenty-third days of each month. *All agencies* ... *submitting ... negative declarations ... shall submit such documents or notices to the [OEQC] before the close of business eight working days prior to the issue date.* ...
(Emphases added.)

**19.** HRS § 91–2 provides in relevant part: "(b) No agency rule, order, or opinion shall be valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been published or made available for public inspection as herein required, *except where a person has actual knowledge thereof.*" (Emphasis added.)

"shall be initiated within thirty days after the public has been informed of such determination *pursuant to section 343-3*." In turn, section 343-3 mandates the OEQC to inform the public of the DPP's negative declaration upon receipt of such notification from the DPP. *See Chock v. Gov't Employees Ins. Co.*, 103 Hawai'i 263, 269, 81 P.3d 1178, 1184 (2003) (recognizing that "where there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored"). Thus, given the plain and unambiguous statutory language, coupled with the related administrative rules discussed above, actual knowledge cannot be "substitute[d] for public notice." Consequently, Kuilima's argument lacks merit.

■ Finally, with respect to HRS § 343-7(a), the period of limitation begins to run upon "the agency's decision to carry out or approve *the action*," or, "if a *proposed action* is undertaken without a formal determination by the agency that a statement is or is not required," then the judicial proceeding must be brought 120 days "after *the proposed action* is started." In the instant case, although the subdivision application was part of the larger action (*i.e.*, the project), the specific "action" for statute of limitation purposes must be deemed to be the date that the subdivision application was approved as opposed to when the project itself was originally approved. Indeed, any other interpretation would be absurd, especially where—as here—the original project was approved over twenty years ago and is not even near completion. *See County of Hawai'i v. C & J Coupe Family Ltd. P'ship*, 119 Hawai'i 352, 362, 198 P.3d 615, 625 (2008) (recognizing that "[t]he canons of statutory construction also require this court 'to construe statutes so as to avoid absurd results'") (citation omitted).

Moreover, HAR § 11-200-2 defines "supplemental statement" as "an additional environmental impact statement prepared for an action for which a statement was previously accepted, but which has since changed substantively in size, scope, intensity, use, location, or timing, among other things." Thus, the administrative rules promulgated to further the purpose and intent of HEPA clearly contemplate the possibility of changes to the original project that may dictate the need for a further environmental impact assessment, *i.e.*, a SEIS. Consequently, it would be absurd to decide statute of limitation issues related to a determination whether a SEIS is required or not required based upon the date of the original project or action because common sense dictates that, in all likelihood, the issue of a supplemental assessment would not arise within 120 days of acceptance of the original EIS or the start of the original project. If such determinations were based on the original project, a great majority of, if not all, judicial proceedings challenging *the SEIS process* would be dismissed as untimely. As indicated above, such a result would be absurd.

Here, DPP tentatively approved Kuilima's November 8, 2005 subdivision application on September 29, 2006. Thus, at minimum, plaintiffs' complaint was required to be filed within 120 days thereof, or by February 5, 2007. The plaintiffs' initial complaint was filed on May 19, 2006 and their first amended complaint was filed on June 7, 2006, well before the limitations period even began to run. Furthermore, even if DPP's January 19, 2006 letter to Shafer, indicating that Kuilima was "entitled to proceed with the project as approved" constitutes "approval" under this section, the plaintiffs' initial complaint (filed May 19, 2006) was still timely, *i.e.*, 120 days from January 19, 2006 is May 19, 2006. Thus, Kuilima's argument that the plaintiffs' claims are barred by the statute of limitations is without merit.

B. *Environmental Council's Authority to Promulgate HEPA Rules*

■ As previously indicated, the ICA majority did not address Kuilima's argument that the Environmental Council exceeded its statutory authority in promulgating HAR §§ 11-200-26 and 11-200-27 and "accordingly[,] no cause of action exist[ed] to require Kuilima to prepare a[ ] SEIS." However, Kuilima reasserts such argument before this court.

Article XI, section 1 of the Hawai'i State Constitution mandates environmental protection, stating:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

To facilitate this constitutional mandate, HEPA was enacted in 1974 "to establish a system of environmental review which [would] ensure that environmental concerns are given appropriate consideration in decision making along with economic and technical considerations." HRS § 343–1. In keeping with this system of environmental review, HEPA requires that an EIS be prepared "if [an] agency finds that the proposed action may have a significant effect on the environment." HRS § 343–5(b) (Supp.2005).

The Environmental Council [20] is charged, pursuant to HRS § 343–6 (1993), quoted *infra*, with the task of promulgating rules to further the purpose of HEPA. In fulfilling its statutory responsibility, the Environmental Council promulgated HAR title 11, chapter 200 that sets forth the "system of environmental review at the state and county levels" which "provide[s] agencies and persons with procedures, specifications of contents of environmental assessments and environmental impact statements, and criteria and definitions of statewide application." HAR § 11–200–1.

Kuilima argues that the Environmental Council exceeded its statutory authority in promulgating HAR §§ 11–200–26 and 11–200–27. More specifically, Kuilima argues that adopting the plaintiffs' interpretation of HEPA would "exceed the enabling legislation of HEPA" by "caus[ing] HAR §§ 11–200–2 [ (the definition section) ], 11–200–26, and 11–200–27 to contravene HRS § 343–5(g), which states that "[a] statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required." We cannot agree with Kuilima.

First, we recognize that HRS § 343–2 (Supp.2005) equates the term "statement" with an EIS.[21] We also recognize that section 343–5(g) limits the number of *original* EISs under HEPA, but does not specifically proscribe SEISs.

Further, HRS § 343–6 states that:

(a) After consultation with the affected agencies, the [Environmental C]ouncil *shall* adopt, amend, or repeal necessary rules for the purposes of this chapter in accordance with chapter 91 [ (entitled, "Administrative Procedure") ] *including, but not limited to,* rules which shall:

> (1) Prescribe the contents of an [EIS];
>
> (2) Prescribe the procedures whereby a group of proposed actions may be treated by a single statement;
>
> (3) Prescribe procedures for the preparation and contents of an environmental assessment;

---

**20.** The Environmental Council was created in 1970, 1970 Haw. Sess. Laws. Act 132, § 1 at 248–50, and is composed of fifteen members from various disciplines, all of whom are appointed by the governor. HRS § 341–3(c) (1993).

**21.** HRS § 343–2 provides in relevant part:
"Environmental impact statement" or "statement" means an informational document prepared in compliance with the rules adopted under section 343–6 [ (quoted *infra*) ] and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.
 The initial statement filed for public review shall be referred to as the draft statement and shall be distinguished from the final statement which is the document that has incorporated the public's comments and the responses to those comments. The final statement is the document that shall be evaluated for acceptability by the respective accepting authority.

(4) Prescribe procedures for the submission, distribution, review, acceptance or nonacceptance, and withdrawal of a statement;

(5) Prescribe procedures to appeal the nonacceptance of a statement to the environmental council;

(6) Establish criteria to determine whether a statement is acceptable or not;

(7) Establish procedures whereby specific types of actions, because they will probably have minimal or no significant effects on the environment, are declared exempt from the preparation of an assessment;

(8) Prescribe procedures for informing the public of determinations that a statement is either required or not required, for informing the public of the availability of draft statements for review and comments, and for informing the public of the acceptance or nonacceptance of the final statement; and

(9) Prescribe the contents of an environmental assessment.

(Emphases added).

 The plain language of HRS § 343–6 clearly authorizes the Environmental Council to promulgate rules that, at minimum, address the nine categories enumerated therein. This court has stated that

[a] public administrative agency possesses only such rule-making authority as is delegated to it by the state legislature and may only exercise this power within the framework of the statute under which it is conferred. Administrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down.

*Haole v. State,* 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006) (citations omitted) (brackets in original). In other words,

an administrative agency can only wield powers expressly or implicitly granted to it by statute. However, it is well established that an administrative agency's authority includes those implied powers that are *rea-*

*sonably necessary to carry out the powers expressly granted.* The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency.

*Id.* (emphasis in original) (citation omitted). Here, the rule-making authority expressly grants to the Environmental Council the power to promulgate rules regarding EISs. However, to further the purpose and intent of HEPA, the Council, as discussed *supra,* clearly contemplated the possibility of changes to the original project that may dictate the need for a further environmental impact assessment, *i.e.,* a SEIS. Thus, the rules promulgated to address SEISs, including HAR §§ 11–200–26 and 11–200–27, are clearly within the "implied powers that are reasonably necessary to carry out the powers expressly granted."

Moreover, the SEIS process established by the Environmental Council is consistent with HEPA and its objectives—*i.e.,* "environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole," HRS § 343–1—and furthers environmental review. Consequently, we hold that the Environmental Council did not exceed its authority in promulgating rules to guide the SEIS process, including HAR §§ 11–200–26 and 11–200–27.

C. *Requirement that Kuilima Complete a SEIS*

With respect to the plaintiffs' arguments regarding the timing of the project, the ICA stated that:

Plaintiffs' only allegation in the circuit court of a "change" in the [p]roject was an alleged change in "timing." Plaintiffs argue that increased traffic, other planned developments near the [p]roject, and the existence of endangered or threatened species constitute "new circumstances or evidence." However, these are not substantive changes in the [p]roject.

When asked what information they had about changes in the [p]roject, each of [p]laintiffs' deposition witnesses admitted

they had no personal knowledge or evidence of changes in the [p]roject, *with the exception of their claim regarding timing.* *Unite Here!,* 120 Hawai'i at 466, 209 P.3d at 1280 (emphasis added). The ICA went on to determine that "[t]he [1985] EIS detailed only an 'approximate phasing of the development for the resort[,]'" and that "[n]either the [1985] EIS nor the governmental entities imposed a timing condition" and ultimately concluded that "[t]he record in this case demonstrates there was no substantial change in the [p]roject," including a change with respect to timing. *Id.*

■■■ The plaintiffs argue before this court that, because: (1) "[t]he EIS's impact analysis relied on basic assumptions about the project's timing by incorporating construction projections in three phases" and (2) twenty-four years have passed since the 1985 EIS was approved, there has been a change in the project's timing such that there is "an essentially different action . . . under consideration." HAR § 11–200–26. In its response, Kuilima contends that a different action is not under consideration because "the [p]roject . . . was not qualified by timing" inasmuch as "[t]he phasing plan for the [p]roject contemplated only a general and approximate plan for development" and "the [u]nilateral [a]greement . . . contemplated a reasonable and flexible schedule." Further, Kuilima argues that, "[e]ven if this [c]ourt concludes that [plaintiffs] have shown a 'change in the timing of the [p]roject,' the [plaintiffs] have failed to connect any new or different 'significant effect resulting from' that alleged change that was not originally disclosed or previously dealt with" in the 1985 EIS.

HAR § 11–200–26 states that:

A statement that is accepted with respect to a particular action is *usually qualified by* the size, scope, location, intensity, use, and *timing of the action,* among other things. A statement that is accepted with respect to a particular action shall satisfy the requirements of this chapter and no other statement for that proposed action shall be required, *to the extent that the action has not changed substantively in size, scope, intensity, use, location, or tim-*

*ing, among other things.* If there is *any change in any of these characteristics which may have a significant effect, the original statement that was changed shall no longer be valid* because an *essentially different action would be under consideration* and a supplemental statement shall be prepared and reviewed as provided by this chapter. As long as there is not change in a proposed action resulting in individual or cumulative impacts not originally disclosed, the statement associated with that action shall be deemed to comply with this chapter.

(Emphases added). This court has stated that "[t]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . [W]here the statutory language is plain and unambiguous, [the court's] sole duty is to give effect to its plain and obvious meaning." *Awakuni,* 115 Hawai'i at 133, 165 P.3d at 1034. The same general principles that apply to statutory interpretation also apply to interpretation of administrative rules. *Allstate Ins. Co.,* 105 Hawai'i at 454, 99 P.3d at 105.

■■■ Based on the plain language of subsection 26, every EIS is inherently "qualified," or limited, by, *inter alia,* "the timing of the action," *i.e.,* some sort of time frame. As the plaintiffs recognized, failing to consider the timing of a project, among other things,

guts environmental review because certainly no one would argue that . . . we don't know how big this project is going to be, we don't know how much density there's going to be on this project, we don't know exactly where on the property this project is going to be located. All of those things need to be set out [i]n an EIS.

We agree. For an EIS to meet its intended purpose, it must assess a particular project at a given location based on an explicit or implicit time frame.

Here, the 1985 EIS explicitly described the scope of the project and centered its analysis on the size, location, intensity, and use of Kuilima's expansion. The 1985 EIS also specifically referenced the "phasing and *timing of the action,*" stating that the "Phase I designation generally indicates a 1986 start

of construction date, Phase II, commencement between 1988 to 1989, and Phase III, [c]ommencement between 1993 to 1996." Although the phasing projections were "flexible," such projections indicate that the 1985 EIS was subject to an implied timing condition or time frame, especially in light of the plain language of HAR § 11–200–26 identifying timing as a consideration.

The record in the instant case indicates that the EIS was based on and limited to data available in 1985 and projected through 2000. As a result, the 1985 EIS addressed only the environmental impacts of the project within that time frame. For example, the evidence in the record indicates that: (1) traffic studies analyzed traffic impact projections through 2000; (2) visitor units, hotel demand, and population growth were also projected and analyzed only through 2000; and (3) monk seal populations were nearly non-existent in the project area at the time and, thus, were not even considered in the 1985 EIS.

■■■ Inasmuch as: (1) over twenty years have passed since the approval of the 1985 EIS; (2) the evidence demonstrates that environmental impacts were examined only through 2000; and (3) the project is not yet completed, we conclude that the project, although unchanged in terms of size, scope, location, intensity, and use, is—due to the change in timing—an "essentially different action," HAR § 11–200–26, thereby rendering "the original statement . . . no longer . . . valid." *Id.* Consequently, contrary to the ICA-majority's opinion, a SEIS may be required and, thus, next examine whether a change in timing "*may* have a significant effect." *See* HAR § 11–200–26.

This court has recently stated that the phrase "may have a significant effect" as used in HEPA means "whether the proposed action will 'likely' have a significant effect on the environment." *Kepo'o v. Kane,* 106 Hawai'i 270, 289, 103 P.3d 939, 958 (2005) (construing HRS § 343–5(c)).[22] Further, the United States Court of Appeals for the Ninth

Circuit has held that, under the aforementioned standard, plaintiffs "need not show that significant effects <u>will in fact occur</u> " but instead need only "raise[ ] **substantial questions whether a project may have a significant effect[ ].**" *Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 562 (9th Cir. 2006) (underscored emphasis in original) (bold emphasis added).

The record in this case—particularly the post–1985 EIS traffic reports—clearly "raises substantial questions," *id.,* regarding changes in the project area and its impact on the surrounding communities. As previously indicated, Challacombe, the County's "most knowledgeable" expert with respect to its obligations to enforce HEPA, testified that timing, although not the sole criterion, is an "important" component in the County's permit review and concurrent determination of whether a SEIS is required. According to Challacombe, "[i]f the surrounding community's changed, we would consider that[.]" He also testified that he was "sure" the County would "require an updated traffic study at the time of building permit application for the Kuilima development" and that "[a] twenty year old traffic study is not sufficient, because . . . there may be factors in the community that have changed, *i.e.,* traffic."

The record suggests that traffic impacts have, indeed, changed since 1985. New evidence documenting changes in traffic patterns in the area have been presented in the form of seven post–1985–EIS traffic studies and reports, including, *inter alia:* (1) the 1991 traffic report; (2) DOT's traffic counts taken on Kamehameha Highway fronting the resort in August 2000; (3) the 2005 Laniakea traffic report; (4) Kuilima's 2005 traffic report; and (5) Kuilima's 2006 Addendum Nos. 1, 2, and 3 to the 2005 traffic report. Based on the description of these reports discussed in section I.A.3., *supra,* it appears that the Kuilima expansion project will result in traffic impacts that were not contemplated by the 1985 EIS, which predicted impacts only through the year 2000. In other words, all of

---

**22.** This court has stated that "[l]ikely is a word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and hav-

ing better chance of existing or occurring than not." *Kepo'o,* 106 Hawai'i at 289 n. 31, 103 P.2d at 958 n. 31.

the post–1985 EIS traffic studies and report suggest that changes have occurred since 1985. The 1985 EIS indicated, for example, that, "[w]hile the increased traffic generated by the proposed resort expansion is significant when compared to the projected background conditions, it is not beyond the carrying capacity of an upgraded, high quality two-lane arterial"; however, Addendum No. 1 predicted in 2006 that, at the project's full development, peak hour traffic operations at the intersection of Kamehameha Highway and Alpha Road "are expected to deteriorate below satisfactory LOS."

Moreover, as previously indicated, the 1985 EIS provided an assessment of the traffic impact to the *region*, *i.e.*, between Haleiwa and Punalu'u and specific traffic data for certain regional areas. However, none of the updated traffic studies involved any regional areas, only impacts upon the areas fronting the resort and within the resort itself. Nevertheless, inasmuch as the entire North Shore area is served by the one two-lane roadway (namely, Kamehameha Highway), it is reasonable to infer that studies showing increased impacts in the local region would likely impact the regional areas.

The record also indicates that beaches and near shore waters within the project area are now used by endangered and threatened species, specifically the monk seal and green sea turtle. The facts indicate that: (1) the project will likely result in increased impacts on the monk seal population because monk seals are vulnerable to harassment by humans and face increased threats in areas where they are exposed to greater human contact; (2) the numerous recently reported sightings of monk seals in the area suggest that the beaches and near shore areas of the project are significant to the regeneration of the monk seal population; and (3) because the project is expected to draw hundreds more people—many of them tourists who are unfamiliar with monk seal protection requirements—the likelihood of increased impacts on monk seals and their regeneration is likely. Moreover, studies conducted after the 1985 EIS was approved have also demonstrated an increase in the green sea turtle population in the project area.

As previously indicated, the defendants argue that there is no "new" evidence that was "not originally disclosed or previously dealt with in the 1985 EIS." However, based on the foregoing discussion regarding the post–1985 EIS reports and studies regarding traffic conditions, monk seals, and green sea turtles, such information clearly qualifies as "new" information or circumstances that were "not originally disclosed," not previously considered, and could have a substantial effect on the environment.

Based on the foregoing, we believe the plaintiffs have clearly presented "new" evidence that was not considered at the time the 1985 EIS was prepared and could likely have a significant impact on the environment. *Kepo'o*, 106 Hawai'i at 289 n. 31, 103 P.2d at 958 n. 31. Consequently, we hold that the project constitutes an "essentially different action . . . under consideration" and, based on the plain language of HAR § 11–200–26, "a supplemental statement [should have been] prepared and reviewed."

Any other result would be both absurd and contrary to public policy in Hawai'i. With respect to the possible absurd result, the ICA dissent aptly observed that:

> [U]nder Kuilima's[,] . . . the [County's, and the majority's] interpretation of the applicable rules and circumstances, because no specific deadline was established for the project's completion, *the 1985 EIS would remain valid in perpetuity and no SEIS could ever be required, so long as no substantive changes to the design of the project were made.*

*Unite Here!*, 120 Hawai'i at 472, 209 P.3d at 1286 (Nakamura, J., dissenting) (emphasis added). Indeed, ignoring the implicit time condition dictated by the anticipated life of the project upon which an original EIS has been based would allow unlimited delays and, in turn, permit possible resulting negative impacts on the environment to go unchecked. In other words, allowing an outdated EIS to "remain valid in perpetuity" directly undermines HEPA's purpose.

 HRS § 343–1 (setting forth the findings and purpose for HEPA) states that

[t]he legislature finds that *the quality of humanity's environment is critical to humanity's well being,* that humanity's activities have broad and profound effects upon the interrelations of all components of the environment, and that an environmental review process will integrate the review of environmental concerns with existing planning processes of the State and counties and alert decision makers to significant environmental effects which may result from the implementation of certain actions....

It is the purpose of this chapter *to establish a system of environmental review which will ensure that environmental concerns are given appropriate consideration in decision making[.]*

(Emphases added). Indeed, this court has repeatedly recognized the public purpose served by HEPA to "ensure that environmental concerns are given appropriate consideration in decision making" such that "environmental consciousness is enhanced, cooperation and coordination are encouraged, and public participation during the review process benefits all parties involved and society as a whole." *See, e.g., Kahana Sunset Owners Ass'n v. County of Maui,* 86 Hawai'i 66, 70, 947 P.2d 378, 382 (1997) (citing HRS § 343–1) [23]; *Citizens for the Protection of the N. Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 104 n. 11, 979 P.2d 1120, 1130 n. 11 (1999) (also citing HRS § 343–1); *Sierra Club v. Dep't of Transp.,* 115 Hawai'i 299, 327 & 342, 167 P.3d 292, 320 & 335 (2007) (referring to HRS § 343–1).

Kuilima argues that the ICA majority's interpretation of HAR §§ 11–200–26 and 11–200–27 "provides a reliable, consistent process that recognizes and balances the developer's interest and the predictability of a project's entitlements with environmental considerations." More specifically, Kuilima adopts the reasoning of the United States

Supreme Court that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized" and that "[t]o require otherwise would render agency decision-making intractable." (Quoting *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (applying federal law)). The County agrees, arguing that, "[i]f every change in circumstances could lead to a[ ] SEIS challenge, even if only to determine whether such change rendered the project 'an essentially different action[,]'[ ] the land use approval would be mired in an untenable gridlock." However, the foregoing analysis does not suggest that supplemental environmental review is required "every time new information comes to light after [an] EIS is finalized." *Marsh,* 490 U.S. at 373, 109 S.Ct. 1851. To the contrary, the conclusion that a SEIS is warranted is based on the particular circumstances *in this case* and on the evidence discussed *supra.* Thus, the defendants' arguments are without merit.

Based on the foregoing, we hold that the circuit court erred in concluding that, as a matter of law, "[t]he timing of the [p]roject has not substantively, or essentially, changed" and that, "[i]n the alternative, even if the timing had substantively changed, which the [circuit c]ourt finds that it has not, such change is not likely to have a significant effect." Consequently, the ICA majority erred in reaching the same conclusion.

### D. *DPP's Review of Kuilima's Subdivision Application*

As previously stated, the ICA, in its majority opinion, did not address the plaintiffs' argument that the DPP did not take a "hard look" at the allegations and evidence presented to it with respect to Kuilima's subdivision application. The plaintiffs make the same contention before this court, and essentially argue that the DPP did not follow the requisite procedure in determining that a

---

**23.** As we explained in *Kahana Sunset,* HEPA review is more than a mere formality; instead it should function

> to provide the agency and any concerned member of the public with the information necessary to evaluate the potential environmental effects of a proposed action ... so that

> the public may be allowed an opportunity to comment and the agency will have the necessary information to understand the potential environmental ramifications of their decisions.
>
> *Kahana Sunset,* 86 Hawai'i at 72, 947 P.2d at 384.

SEIS was not required. In response, Kuilima argues that the DPP did, in fact, take a "hard look" at "the alleged 'intensity of impacts' and 'new circumstances and evidence'" and, as a result, the DPP followed the requisite procedure and did not act arbitrarily or capriciously in deciding not to require a SEIS.

Neither the case law in this jurisdiction nor HEPA itself offers guidance as to which standard of review should apply to an agency decision regarding a SEIS. However, this court has reviewed an agency's decision whether an EIS satisfies the statutory requirements under the "rule of reason" standard. *See Price,* 81 Hawai'i at 182, 914 P.2d at 1375. As applied to considerations of the *adequacy of an EIS,* this court has stated that:

> In making such a determination the court is guided by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives.

*Price,* 81 Hawai'i at 182, 914 P.2d at 1375 (quoting *Life of the Land,* 59 Haw. at 164–65, 577 P.2d at 1121 (citation omitted)) (footnote omitted). Moreover, we have recognized that

> a court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, *the court must ensure that the agency has taken a "hard look" at environmental factors.*
>
> If the agency has followed the proper procedures, its action *will only be set aside if the court finds the action to be "arbitrary and capricious," given the known environmental consequences.*

*Id.* at 182 n. 12, 914 P.2d at 1375 n. 12 (citing *Stop H–3 Ass'n v. Lewis,* 538 F.Supp. 149, 159 (D.Haw.1982)) (emphases added). Inasmuch as this court has applied the "rule of reason" and "arbitrary and capricious" standards of review with respect to EISs and agency decisions relating to environmental consequences, we extend such standard of review to cases involving an agency's decision with regard to SEISs.

As previously mentioned, in assessing Kuilima's subdivision application to determine whether to require a SEIS, the DPP's rationale was that the phasing or timing of the project was irrelevant, and, thus, it looked for changes only within the project itself. However, evidence in the record indicated that there was, indeed, a substantive change in the timing of the project such that an "essentially different action" was under consideration, HAR § 11–200–26, thereby rendering the "original statement . . . no longer . . . valid," *id.,* and, thus, dictating the need for a SEIS. The DPP ignored the most obvious fact that the 1985 EIS was based on detailed information *current as of 1985, i.e.,* that the conditions upon which the 1985 EIS was based were over twenty years old. For the DPP to assume that conditions would not have changed over twenty years is unreasonable, especially given the "new" evidence with respect to traffic, monk seals, and green sea turtles, discussed *supra.* Thus, it cannot be said that "the agency has taken a 'hard look' at [the] environmental factors." Given the unreasonable and seemingly cursory consideration of whether a SEIS was warranted, we hold that the DPP's decision that one was not required was "arbitrary and capricious."

## IV. CONCLUSION

Based on the foregoing, we vacate the ICA's June 12, 2009 judgment on appeal, the circuit court's June 4, 2007 amended final judgment in favor of the defendants, and remand this case to the circuit court with instructions to enter judgment in favor of the plaintiffs.

Concurring Opinion by ACOBA, J.

I concur in the result.

It would seem irrefutable that an environmental impact statement (EIS) cannot exist

in perpetuity. *See Unite Here! Local 5 v. City & County of Honolulu*, 120 Hawai'i 457, 472, 209 P.3d 1271, 1286 (App.2009) (Nakamura J., dissenting) (stating that "under . . . [the] interpretation of the applicable rules and circumstances [by Respondents/Defendants–Appellees City and County of Honolulu (City) and Kuilima Resort Company (Kuilima)], because no specific deadline was established for the project's completion, the 1985 EIS would remain valid in perpetuity"). But a construction of the provisions of Hawai'i Revised Statutes (HRS) chapter 343 that would lead to a result other than the one reached here would affirm or produce the converse of that proposition. Consequently, the reasonable resolution of this writ is to order that summary judgment be entered in favor of Petitioners/Plaintiffs–Appellants Keep the North Shore Country and Sierra Club, Hawai'i Chapter [collectively, Plaintiffs], and against Respondents/Defendants–Appellees City, Henry Eng, Director of the Department of Planning and Permitting (DPP), and Kuilima [collectively, Defendants], granting the requested declaration that a supplemental environmental impact statement (SEIS) be required.

A contrary result would also violate the legislature's underlying purpose in enacting HRS chapter 343. HRS § 343–1 (Supp.2006) states, "It is the purpose of this chapter to establish a system of environmental review *which will ensure that environmental concerns are given appropriate consideration in decision making* along with economic and technical considerations." (Emphasis added.) Manifestly, the purpose of requiring an EIS is to ensure that agencies like the DPP are able to make informed decisions regarding projects that will impact the surrounding environment.

This court has stated that an EIS will be upheld if, among other things, it contains "sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives." *Price v. Obayashi Hawaii Corp.*, 81 Hawai'i 171, 182, 914 P.2d 1364, 1375 (1996) (quoting *Life of the Land v. Ariyoshi*, 59 Haw. 156, 164–65, 577 P.2d 1116, 1121 (1978)) (footnote and citation omitted). However, it cannot be said reasonably that "environmental concerns are given appropriate consideration in decision making," HRS § 343–1, when the information is incomplete or outdated. Nor can it be said that in cases where information is outdated, agencies are able to "balanc[e] the risks of harm to the environment against the benefits to be derived from the proposed action[.]" *Obayashi*, 81 Hawai'i at 182, 914 P.2d at 1375. It would be inconsistent with the express purpose of HRS chapter 343 to conclude that agencies may rely on an EIS in making decisions when the information contained therein is insufficient.[1] Thus, an EIS cannot

---

1. In their first amended complaint, Plaintiffs requested declaratory relief, stating that, "Plaintiffs respectfully request that this [c]ourt enter judgment and provide the following relief . . . [a] declaratory judgment that a [SEIS] must be prepared for the [p]roject and submitted in accordance with [HRS chapter 343]." Plaintiffs argued that the DPP, as the reviewing authority, was required to attach further conditions on approval of the subdivision application in order to ensure that changes not addressed by the 1985 EIS were examined. Plaintiffs' letters to the DPP specifically pointed to changes in traffic, population density, and the habitats of endangered species as examples of the changed circumstances and noted that more information should be obtained before proceeding with the project.

The DPP responded that, "because no specific time limit had been imposed on the [p]roject at the time of the [p]roject's initial approval, the DPP felt it could not require an SEIS to address changes in the conditions surrounding the [p]roject caused by the passage of time." *Unite Here!*, 120 Hawai'i at 461, 209 P.3d at 1275. According to the DPP, "[b]y not imposing any time limits at the time, the City Council indicated that the project could be developed at its own pace. Further, as a matter of law, the [City] cannot retroactively impose time limits or unilaterally rescind an entitlement like an approved discretionary permit." *Id.* The DPP's response to Plaintiffs' letters plainly constituted a denial of Plaintiffs' request to attach new conditions to the grant of the subdivision application despite claimed changes in circumstances and the passage of time. Thus, the issue before the court was whether the DPP abused its discretion in reaching that conclusion.

be relied on reasonably for an indefinite period of time.[2]

Supportive of this view, Hawai'i Administrative Rules (HAR) § 11–200–13(c) limits an agency's ability to utilize previous material in making a determination to approve or deny an action.

> (c) Agencies shall not, without considerable pre-examination and comparison, use *past determinations and previous statements* to apply to the action at hand. *The action for which a determination is sought shall be thoroughly reviewed prior to the use of previous determinations and previously accepted statements.* Further, when previous determinations and previous statements are considered or incorporated by reference, they shall be substantially similar to *and relevant to the action then being considered.*

HAR § 11–200–13(c) (emphases added). Accordingly, the DPP had a duty to make an independent determination as to whether the EIS contained sufficient information to enable it to make an informed decision regarding the subdivision application. It is not sufficient that the information had been "previously accepted." *Id.* The information in the EIS must be "relevant to the action then being considered." *Id.* In the instant case, Plaintiffs alleged numerous changes to the area surrounding the project, calling into question the relevance of the information contained in the 1985 EIS to the action proposed, namely, approval of the subdivision application.[3]

The changes that Plaintiffs alleged related directly to the sufficiency of the information contained in the EIS.[4] As the majority indicates, the standard to be applied to agency determinations regarding the adequacy of an EIS is the "rule of reason." Majority opinion at 181, 231 P.3d at 454. Under the rule of reason,

> an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after

2. The EIS specifies that the project will be developed in three phases. As Plaintiffs explained in their first amended complaint,

> 37. *The [p]roject proposed three phases: "Phase I generally indicates a 1986 start of construction date, Phase II, commencement between 1988 to 1989, and Phase III, commencement between 1993 to 1995."* Kuilima EIS at 31.
>
> 38. Over 20 years elapsed since completion of the 1985 EIS, over 20 years have passed since the anticipated start date of the [p]roject, and *approximately 10 years passed since the last phase of the [p]roject was anticipated to be initiated.*

(Emphases added.) Furthermore, the initial EIS contained traffic projections until the year 2000. Despite there being no exact date by which the project was to be completed, and allowances being made for delays due to changed economic conditions and other factors, a reasonable time limitation on the relevancy of the EIS may be inferred based on both the contents of the EIS itself as well as changes in the circumstances surrounding the project.

3. Plaintiffs alleged numerous changed circumstances around the project. The first amended complaint stated:

> 22. Since 1985, much has undeniably changed in the North Shore.... Substantial additional residential development has also oc-

curred or is planned, including projects in Mālaekahana (120 housing lots) and Lā'ie (550 housing units). The current portions of the [p]roject which [Kuilima] is now proposing to undertake, *20 years after the 1985 EIS, will result in significant environmental impacts or increased intensity of impacts not previously evaluated, considered, predicted, or planned.* These impacts, include, but are not limited to, environmental impacts and cumulative effects relating to increased visitor trips; *increased peak and non-peak traffic; increased demand on limited water resources, wastewater capacity, electrical peak capacity, and infrastructure; increased impacts on sensitive wetland and endangered water bird habitat; and increased impacts on public access to the shoreline, visual view planes and aesthetics values.*

(Emphases added.)

4. Allegations in the first amended complaint relating to wildlife, traffic, and natural resources all relate to the viability of the original EIS. Such evidence goes directly to establishing that the DPP violated the rule of reason in making its determination that no further conditions would be imposed on the subdivision application. As previously stated, the DPP had an independent obligation, pursuant to HAR § 11–200–13(c) to determine whether the information in the EIS was still adequate to support an informed decision regarding the subdivision application.

balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. *Obayashi*, 81 Hawai'i at 182, 914 P.2d at 1375 (quoting *Life of the Land*, 59 Haw. at 164–65, 577 P.2d at 1121) (footnote and citation omitted). This standard regarding the adequacy of an EIS relates to court review of whether the agency is sufficiently apprised as to the surrounding circumstances in order to determine whether a project should proceed. Such a standard is no less applicable in the instant case, where there are questions as to whether the information in the EIS is adequate to inform the DPP's decision as to whether to grant the subdivision request.

An agency's initial determination that a project's impact can be sufficiently mitigated to warrant the project's approval relies heavily on projections regarding matters such as traffic and environmental impacts. Such projections are of questionable value as the project's estimated completion is moved far into the future. *See, e.g., Obayashi*, 81 Hawai'i at 183, 914 P.2d at 1376 (stating that an EIS must "enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action") (quoting *Life of the Land*, 59 Haw. at 164–65, 577 P.2d at 1121).[5] Thus, an agency's determination of whether an EIS and the measures the EIS contains to minimize the negative impacts on the surrounding area are relevant, should be reviewed under the rule of reason. In making its assessment of the agency's decision, the reviewing court must examine 1) the anticipated completion date of the project or implied completion date, 2) the extent to which the EIS addressed future changes in the circumstances surrounding the project, and

3) the extent of changed circumstances surrounding the project. Such a standard should be regarded as analogous to a review for abuse of discretion inasmuch as the rule of reason gives agencies broad discretion, but does not permit them to "exceed[ ] the bounds of reason or disregard[ ] rules or principles of law[.]" *Williams v. Aona*, 121 Hawai'i 1, 7, 210 P.3d 501, 507 (2009) (citation omitted).

---

**5.** In essence, the DPP's conclusion was that the EIS was valid as long as there were no changes to the size or scope of the project. The assumption underlying this determination is that the information contained in the EIS was sufficient to enable the agency to render an informed decision. Plaintiffs brought their action to the court challenging the declaration of the DPP that "as long as Kuilima was following the appropriate subdivision rules and regulations, the [City] was obligated to continue to process the [s]ubdivision [a]pplication." *Unite Here!*, 120 Hawai'i at 461, 209 P.3d at 1275. However, in its order granting summary judgment in favor of Kuilima, the court concluded that it was not required to review whether there were significant changes to the area surrounding the project.